Opinion

per curiam:

The narrative necessary to the
understanding of this case is given in our findings. The evidence proves, to a moral certainty, that the plaintiff’s claim is vitiated by fraud. Pursuant to the provisions of Section 2514 of Title 28 of the United States Code, the plaintiff’s *661 claim is forfeited to the United States. The plaintiff’s petition will be dismissed.
It is so ordered.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Geo. H. Foster, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Jose K. Lapus, is a native-born Filipino, and brings this suit as such. United States citizens may bring action against the Government of the Philippines in the Philippine courts.
2. At the beginning of World War II plaintiff was general sales, manager for Twentieth Century-Fox in Manila. He had previously considerable experience in the moving picture business in Manila. After the Japanese occupied Manila, a Japanese civilian administration took over all the American companies in Manila and plaintiff became unemployed.
3. Plaintiff began buying movable properties and selling them to Chinese merchants who in turn sold them to the Japanese. He stopped selling to the Chinese merchants about October 1942 and began selling direct to the Japanese. He continued to do so up until the time the Japanese purchasing agents fled Manila.
4. In December 1944 plaintiff was living at 1026 and 1028 Anacleto Street in Manila. He had rented these properties after they were built in 1943. The partition between 1026 and 1028 was removed by him in part and thereafter the door to 1028 was closed and access to 1028 was only from 1026. At that time he had an office on the ground floor of 1026 and another office for office help on the ground floor of 1028.
These premises are what in the Philippines are called accessories and they are comparable to row houses in the United States. Each is about 13 feet wide, 2y2 stories high, and about 35 or 40 feet deep. Each has two doors opening on the sidewalk, one for the upstairs apartment and one for the street floor apartment.
The premises abut on the sidewalk and have a small yard behind them. They are of rather light construction, having been built by the owner from lumber salvaged when a Philip *662 pine club bouse, situated on the same street, was demolished. Later, two additional apartments were built between 1028 and the site of the demolished club house, numbered 1080 and 1032. These were also constructed from the salvaged lumber and additional salvaged lumber was stored on the site of the club house.
5. Some time after Lapus began occupying the premises at 1026 and 1028, he brought a Filipina to live with him there as his “querida” (paramour). Lapus and she had previously lived together in the Santa Ana district of Manila since the latter part of 1943. While living at the Anacleto address, he brought his three children there who had been living with his mother and sister about a block from 1026 Anacleto Street. Some time prior to December 13, 1944, plaintiff and his family moved to a location some four blocks north of Anacleto Street.
Two weeks or ten days before the American Army entered Manila, about February 4, 1945, plaintiff moved his querida and one of his children to the south side of Manila to the Paco district.
6. The plaintiff Lapus left his querida and his child at the home of his querida’s aunt in Paco, explaining that he was going to the hills to join the guerrillas. He indicated the vicinity as being Montalban which was about 20 or 25 miles east of Manila.
This was not the direction from which the American Army was then approaching Manila. Plaintiff’s whereabouts from that date to March 2,1945, remain in doubt. On the witness stand in this case in 1952 he related a story about having been arrested by guerrillas the latter part of February 1945, and tortured by them for days until he was rescued by an officer and turned over to the American Counter Intelligence Corps. In an affidavit filed with a claim which he later filed with the Claims Service in 1948, plaintiff stated that he was in Laguna Province on business in January 1945 when he was captured and tortured by the Japanese and later placed in a truck by his captors. While the truck, along with others, was proceeding on the National Highway, several American planes came overhead and strafed the trucks, killing several Japanese. He then, according to this affidavit, with the assist- *663 anee of other Filipinos, killed the remaining Japanese and later joined American soldiers who were among those who constituted the spearhead of the attacking forces. He claims he fought his way with them back to Manila. After staying with these forces for months, he became ill and was placed in a hospital, later returning to his home. He then found to his surprise that the contents of his home had been taken by the American Army. He also testified in this case that he was at the Anacleto address in late January 1945, at which time he changed the combination on one of his safes.
7. Plaintiff was arrested as a collaborator with the Japanese on March 2, 1945, and placed in confinement by the American Army or the Philippine Government. He was confined there until he was released on September 28, 1945, on bail.
Plaintiff was formally charged by the Philippine Government in Criminal Case No. 6972 for treason on five counts. The first two counts related to military treason and the last three related to economic collaboration. The three counts relating to economic collaboration were dropped following Amnesty Proclamation No. 21, issued January 28, 1948, by President Rosas of the Philippines. The first two counts were dropped sometime after September 1950 for insufficiency of evidence.
8. Shortly after the arrival in Manila of the American Forces and about the middle of February 1945, the commanding officer of the 37th Counter Intelligence Corps of the 37th Infantry Division, received information that the plaintiff was a Japanese collaborator who had served as a purchasing officer for the Japanese forces, and that he had a warehouse in Manila where he had stored a number of items which belonged to the Japanese. About a week later this officer located the supposed warehouse at 1026 Anacleto Street, and opened and searched both apartments of this house for documentary evidence of plaintiff’s collaboration with the Japanese. While the upstairs had the appearance of being living quarters, the rest of the two apartments appeared to this officer to be offices and storerooms. Among the articles stored there were a number of safes. The safes were locked and the search for documents was confined to *664 open drawers in the large number of desks and in other cabinets. Upon completion of the search, with such evidence as he found, he left one of his men at the house and reported this information to his superior. intelligence officer. The information was then given to the division supply officer. Arrangements were made at that time to have the military police of the 37th Infantry Division post a guard on the premises. A 24-hour Army guard was maintained on the premises numbered 1026 and 1028, thereafter, for about a week or ten days.
A few days later, after further investigation, trucks sent by the quartermaster of the 37th Infantry Division removed property from the premises (1026 and 1028). The removal was for the purpose of safeguarding the property until the proper owners of the various pieces could prove their right. It was the original intention that all property removed would be sent to the place designated as the storage area for such property as appeared to have been looted from rightful owners. This place was the Manila Car Barns located in the northern part of Manila in the 37th Division Area. However, the commanding general of the 37th Division asked for and received permission to use in his headquarters a portion of this property, such as filing cabinets, refrigerators, dining room tables and chairs.
Not all the property in 1026 and 1028 was taken by the Army. The removal was made by use of weapons carriers (%-ton trucks) except for one 1%-ton truck, and the removal was completed in about one day’s time. The guard was relieved the next day. The property taken to the 37th Division Headquarters was such as could be used for the comfort of the troops.
9. On January 24, 1948, plaintiff prepared a claim for P (pesos) 4,831,852 as the value of property “taken and commandeered by the 37th Division U. S. A.” This claim, with a supporting affidavit of plaintiff executed on March 22,1948, was filed with the U. S. Army Claims Service, Philippines, Ryukyus Command, Manila, P. I. The affidavit stated that the properties were stored in 1026,1028,1030,1032, Anacleto Street and on the site of the demolished club house on *665 Anacleto Street, and that an inventory of the properties was contained in a book which was submitted with the claim. (Joint Exhibit C-2)
The affidavit stated that in the safe listed in the inventory were gold, silver, and platinum bars, diamond rings, watches, gold pen and pencil sets, assorted jewelry, Philippine currency, and other valuable papers. The alleged contents of the safe were said to be of the value of 9*1,593,005.
The claim was, on May 18,1948, disapproved by the Contract Claims Commission No. 57 “for the reason that the evidence on file is insufficient to establish the validity thereof so as to warrant payment of same.” Plaintiff later requested reconsideration of the claim and thereafter it was referred to the Foreign Claims Commission No. 58 of the Army Claims Service. On December 18, 1948, the Commission reconsidered disapproval on the grounds that the amount claimed exceeded the jurisdictional amount of a 3-man Foreign Claims Commission.
On December 21, 1949, the claim was forwarded to the Judge Advocate General of the Army, and plaintiff has not since been advised as to what action has been taken in respect of the request for reconsideration.
10. Plaintiff had some control over the houses bearing the numbers 1030 and 1032 Anacleto Street but no property was taken by the Army from these houses.
On March 3, 1945, while confined in Bilibid Prison, in Manila, plaintiff wrote a letter to his querida in which he listed such of his property as he could remember that was taken by the American Army. He stated where the property was stored in 1026 and 1028, that is, the upstairs floor, the mezzanine, and on the ground floor. He did not refer to any property stored in 1030 and 1032 but he did tell his querida to rent those premises. He did not state that any property was stored in the club house area.
The credible testimony as to the property in 1026 and 1028 conforms to the statements of plaintiff in this letter insofar as location of storage is concerned. The quantities stated in the letter are many times less than the quantities given in the claim filed in. 1948.
*666 11. The property removed and taken to the headquarters of the 37th Division consisted of the following items:
45 to 50 restaurant type tables, about 30" square 185 to 200 wooden chairs to accompany the tables
2 restaurant type electric refrigerators (30-35 cubic ft.)
3 to 5 standard electric refrigerators (7 to 10 cubic ft.)
4 or 5 typewriters
3 to 5 adding machines and calculators
4 or 5 bench type wooden settees
2 or 3 boxes of drinking glasses (about 100 to the box)
1 set of stainless steel or silver plated tableware
2 or 3 typewriter tables
8 to 10 double pedestal office desks
2 to 5 electric fans on stands about 15 steel file cabinets
This property was all in used condition, somewhat scratched, scarred, etc., but it was serviceable and the men and officers of the headquarters of the 37th Division put it to use for about 30 days. It was inventoried and taken up on the property returns by the property officers of the 37th Division and later turned over to another headquarters on memorandum receipt. Later it was transferred to the Eental and Property Agency before ¡the 37th Division left Manila. The Rental and Property Agency was the agency charged with safeguarding and disposing of property of unknown ownership. There is no evidence as to the final disposition made of the property that was taken to the Car Barns.
12. The property used by the 37th Division did not exceed $10,000 in value.
13. In the letter to his querida, written by plaintiff on March 3, 1945, while in Bilibid Prison, she was told “to present our claims on my property confiscated.”
The following table shows a comparison of the number of units of some of the items listed by the plaintiff in that letter and the number of such units for which compensation is sought in the instant suit.

*667
Items Numbers Listed in Claim Numbers Listed In Letter

Steel bars_ 20, 000 Kilos 3, 500 Kilos
Steel safes_ 90 25
Adding machines_ 68 5
Typewriters_ 11 96
Check writers_ 1 16
Piccolo water heaters_ 3 20
Gas stoves_ 30 93
G. I. Sheets_ 60 130,000
Barber chairs_ 8 28
Tables, narra_ 30 266
Sodium cyanide (drums) 63 250
Drums of grease & oil__ 7 200
14. Also, in the letter of March 3,1945, plaintiff requested his querida to “have Ocampo make the inventory right away.” Yet, according to the testimony of plaintiff’s witnesses, the basic foundation for the proof of the claim is an inventory book allegedly prepared by another employee between October 6, 1944, and November 30, 1944.
The testimony of this former employee was that the quantities listed in the book resulted from a physical, piece-by-piece inventory. It was not a stock record of items purchased and sold.
Other testimony was that the list in the claim of January 1948 was copied from the list in the inventory book. There is, however, an item in the claim that is not in the inventory in the book.
Of the 80 different items in the inventory and the claim, 17 are in quantities of thousands, and in each case all are in exact multiples of one thousand. The quantities stated in the claim are exactly the same as the total of the purported purchase vouchers, covering a period from about July 1944 to November 1944.
15. It is incredible that the plaintiff, in occupied Manila and its environs, could have acquired between June and November of 1944, after two and one-half years of Japanese occupation, the kinds of goods in the amounts which the plaintiff claims. Many of these kinds of goods were not being manufactured in Manila, nor were they imported during the Japanese occupation.
*668 It is impossible that the plaintiff could have acquired goods of the various kinds from numerous vendors, in quantities shown on the purported purchase vouchers to be non-rounded figures, and that the sums of these figures should happen to be the round multiples of 1,000 shown in the inventory book. The purported purchase vouchers were purposely written with numbers which would add up to the round figures written in the inventory book.
The following list shows the numbers of alleged purchases of certain of the items based on the actual quantities of purchases shown on vendors’ receipts offered in evidence by the plaintiff: (Plaintiff’s Exhibit No. 4)

Item. Quantity Total of Vendors

Hack saw blades_ 50, 000 12
Carpenter’s saws_ 10, 000 10
Steel squares_ 5,000 6
Steel chisels_ 4, 000 9
Wood meters_ 5, 000 8
Wood planes_ 5, 000 6
Pipe 2" x 20'_ 25, 000 8
Pipe y/' x 20'_ 35, 000 12
Pipe 1" x 20'_ 30, 000 16
G. I. sheets corrugated. 80, 000 11
G. I. sheets plain_ 50, 000 8
Faucets_ 10, 000 6
Hammers_ 10, 000 6
The weight of three of the items listed in the claim was as follows:
130,000 G. I. sheets_ 1,439 tons
200 drums of petroleum_ 50 tons
250 drums of sodium cyanide_ 25 tons
If the drums alone were stored on end, unstacked, they would have required 1800 square feet of storage floor space. All the property listed could not have been stored in 1026 and 1028 Anacleto Street and no property was taken by the Army from any other place on Anacleto Street. If plaintiff had owned such a quantity of such property, it was stored somewhere else and there is no evidence that the American Army took any property from plaintiff that was stored elsewhere. The story of the existence of this large inventory, its storage, and its removal by the U.S. Army is a fabrication.
*669 FINDING PURSUANT TO SEC. 2514, TITLE 2 8, U. S. CODE
16. The plaintiff, Jose K. Lapns, with the assistance of his attorney, Filemon Q. Almazon, in presenting the claim to the United States Army Claims Service in Manila for property taken and commandeered by the 37th Division, U.S.A., attempted to practice a fraud against the United States in the proof, statement, establishment, or allowance of a claim against the United States.
' The gross inflation of the amount of property taken, as well as the nature of property taken, could not have resulted from mistake. There is nothing to suggest that plaintiff’s Washington attorneys, the late William W. Barron, Bobert F. Klepinger, and William H. Webb, whose names were attached to the petition filed herein June 27, 1950, were parties to the attempted fraud.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff corruptly attempted to practice, and did practice, fraud against the United States in the proof or establishment of his claim. Accordingly, pursuant to Section 2514 of Title 28 of the United States Code, plaintiff’s claim is forfeited to the United States, and his petition is dismissed.