Edward William HULL, a/k/a Edward Hull, et al., Appellants,

v.

EATON CORPORATION, et al.

Edward William HULL, et al. Travelers Insurance Company, Appellants,

v.

EATON CORPORATION, et al.

Nos. 85–6024, 85–6039.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1986.

Decided Aug. 4, 1987.

Edward L. Genn, Washington, D.C., for appellants, Hull, et al. in No. 85–6024 and for cross-appellees Hull, et al. in No. 85–6039.

William Clague, Bethesda, Md., for appellant, Travelers Ins. Co. in No. 85–6039.

Robert H. Stier, Jr., with whom Philip L. Cohan, Washington, D.C., was on the brief for appellees in Nos. 85–6024 and 85–6039.

Before SILBERMAN and WILLIAMS, Circuit Judges and JAMESON,[*] Senior District Judge.

Opinion Per Curiam.

PER CURIAM:

Appellants Edward William Hull and Shirley Hull filed this products liability action against Eaton Corporation (Eaton) and Yale Industrial Trucks Baltimore-Washington, Inc. (YIT),[1] seeking damages for injuries sustained by Mr. Hull while operating a forklift manufactured by Eaton and sold by YIT to Hull's employer, Giant Foods, Inc. ("Giant").[2] The Travelers Insurance Company, the carrier for Hull's worker's compensation claim, intervened. After the Hulls failed to identify their intended expert witness pursuant to Eaton's discovery request and the court's order, the district court imposed a sanction precluding the plaintiffs from introducing expert testimony. Subsequently, the court granted Eaton's motion for summary judgment, holding that (1) the plaintiffs would be unable to make out a case of products liability without expert testimony; (2) the plaintiffs' breach of warranty claim was barred by the statute of limitations; and (3) Eaton could not be held liable for the wrongful acts of YIT.

## I.

On January 14, 1981, Mr. Hull was operating forklift number 501 at Giant's Landover, Maryland warehouse. The forklift is equipped with a counterweight which enables it to lift heavy loads. The counterweight sits on two hooks extending from the frame, and is further attached by three bolts which are threaded into the backside of the counterweight from the frame. The heads of the bolts are countersunk into the frame and covered by the battery. When the counterweight is properly installed, the bolts stabilize it and prevent it from moving horizontally or vertically and disengaging from the mounting hooks. At the time of the accident these three bolts were not in place. Thus, the hooks were all that secured the counterweight to the frame of the forklift. As Hull was driving the forklift through the warehouse area, he hit a bump which caused the left front end of the forklift to dip. When the front end of the forklift dipped, the counterweight slipped off the hooks and fell to the ground, causing an overhead guard which was attached to the counterweight to fall on Hull and injure him.

Eaton manufactured the forklift and delivered it to YIT in December, 1977. The forklift was originally equipped with a counterweight that gave it a 2500 pound carrying capacity. Sometime after delivery to YIT, the original counterweight was replaced with a heavier counterweight that increased the forklift's lifting capacity to 3000 pounds. Giant purchased the forklift from YIT in February, 1978, and YIT informed Eaton of the changed counterweight late that month.

The Hulls' complaint sets forth claims for relief based on strict liability in tort, negligence, failure to warn, and breach of express and implied warranties. The common theory underlying each claim is that if the counterweight had been properly attached to the frame with the three bolts, the accident would not have happened. The strict liability claim asserts that Eaton's design of the forklift was defective because the bolts were removable and the operator could not determine by casual inspection if the counterweight was properly attached. Under the negligence claim, Eaton's manufacture and sale of the forklift with concealed and removable bolts breached a duty of care owed to the Hulls. The failure to warn claim is based on the allegation that Eaton had a duty to warn of the special dangers that resulted from the de-

---

[*] Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Although YIT was originally named as a defendant, it was never served with process; nor did it ever appear as a defendant. Apparently it went into bankruptcy sometime before the plaintiffs commenced this action.

2. The case was originally filed in District of Columbia Superior Court, but was removed to federal district court for the District of Columbia.

sign of the forklift. Finally, according to the warranty claim, Eaton breached a contractual obligation to deliver the forklift in merchantable condition. Subsequent to filing their complaint, the Hulls raised even an additional claim—that Eaton was vicariously liable for YIT's negligent installation of the replacement counterweight.

On April 21, 1983, Eaton filed interrogatories, including one that requested the identity, qualifications, and expected testimony of the plaintiff's expert witnesses. Almost eight months passed without an answer to that interrogatory, and Eaton obtained an order from a magistrate compelling the plaintiffs to respond by January 16, 1984. Plaintiffs then filed a "supplemental answer" refusing to name an expert on the grounds that they had not obtained sufficient information from Eaton concerning sales of forklifts of the type involved in the accident. Thereafter, Eaton filed a motion to sanction the plaintiffs under Federal Rule of Civil Procedure 37. Subsequent to a June 11, 1984 hearing at which the plaintiffs again refused to answer the interrogatory, the magistrate granted the sanctions motion and entered an order precluding the plaintiffs from presenting expert testimony at trial on the liability issue. The district judge held a hearing on October 5, 1984, and—the plaintiffs still refusing to name their expert witness—entered an order affirming the magistrate's sanction.

The district court granted Eaton's motion for summary judgment on November 21, 1984. The court held that the critical facts in the strict liability, negligence, and failure to warn claims were the risks, costs and benefits of alternative designs of the forklift, and that determination of these facts required expert testimony. Because the plaintiffs could not introduce expert

testimony as a result of the discovery sanction, the district court held that they were unable to make out essential elements of these claims. In addition, the court held that the plaintiffs' breach of warranty claim was barred by a four year statute of limitations, and that the relationship between Eaton and YIT was not such that Eaton could be held vicariously liable for YIT's negligent installation of the replacement counterweight.

On appeal the Hulls contend that there are genuine issues of material fact and that the district court's holding on each of the claims was erroneous. They argue that (1) they had no need to produce an expert witness, because the district court erred as to the necessary elements of strict liability, negligence and failure to warn claims, and because they offered evidence showing the existence of a prior alternative design of the forklift; (2) the court should have applied the "discovery rule" to determine when the statute of limitations began to run on the breach of warranty claim; and (3) the record contains sufficient facts to establish a genuine issue as to whether Eaton is vicariously liable for the tortious acts of YIT. In addition, Travelers—but not the Hulls—argues that the discovery sanction was improper.

## II.

We first consider the argument that the district court erred in imposing the discovery sanction under Federal Rule of Civil Procedure 37.[3] Travelers contends that where, as here, a sanction precluding plaintiffs from presenting certain evidence at trial is combined with a district court holding on summary judgment that without that evidence the case must be dismissed, the discovery sanction becomes in effect a

---

**3.** Rule 37(b)(2) provides in pertinent part as follows:

If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

....

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence; (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

dismissal of the case. Since appellants were never warned by the district judge that their failure to name an expert witness would lead to *de facto* dismissal of their case, it is argued, the sanction was so harsh as to constitute an abuse of discretion. We disagree.

The determination of an appropriate discovery sanction is left to the discretion of the trial court. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976). "The question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have [imposed the sanction]; it is whether the District Court abused its discretion in so doing." *Id.* Never will the case on appeal look as it does to a district judge faced with the need to impose reasonable bounds and order on discovery. "We may reverse the trial court only if … its actions were clearly unreasonable, arbitrary or fanciful." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 (D.C.Cir.1984).

■ We reject the argument that the district court abused its discretion by failing to consider the practical effect its sanction order would have on appellants' case, even assuming the effect could have been discerned at the time the sanction was imposed.[4] A judge can certainly impose a $10,000 sanction on a party whose discovery violation causes his opponent $10,000 in added expenses without inquiring whether the violator can afford to pay the fine. So too, we believe, can a judge sanction a party's continued and unexcused refusal to name an expert witness by precluding testimony from any such witness with-

out first determining how badly the party needs the witness. Rule 37(b)(2)(B) explicitly authorizes the court to prohibit a party who fails to obey a discovery order from introducing designated matters in evidence. In light of appellants' representations to the magistrate that they did not even intend to use an expert witness, such a sanction seems eminently reasonable.[5] District judges face great difficulties in controlling discovery procedures—which, all too often, are abused by one side or the other. *See, e.g., Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686 (D.C.Cir.1987). We, sitting as appellate judges, must thus support the trial judges' reasonable use of sanctions to control discovery.

### III.

#### A.

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the record in the light most favorable to the nonmoving party. *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1155 (D.C.Cir.1984). In the recent case of *Celotex Corp. v. Cotrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), the Supreme Court held:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

---

**4.** It's not always clear what effect certain rulings will have on the ultimate outcome of a case, especially in an area of law so unsettled as products liability. Here, the discovery sanction was entered on October 16, 1984, while summary judgment was not granted until November 21, over a month later. Travelers would apparently have us require the district judge to have decided the motion for summary judgment *before* deciding the sanctions motion—unless he could have predicted, accurately, the impact of the sanction.

**5.** *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365 (9th Cir.1980), is distinguish-

able. There, the court stated that, "[n]either dismissal nor preclusion of evidence that is tantamount to dismissal may be imposed when the failure to comply with discovery orders is due to circumstances beyond the disobedient party's control." *Id.* at 1369. Here, there is nothing in the record suggesting that circumstances beyond the plaintiffs' control prevented them from complying with the discovery request. Rather, their refusal to comply was willful. *See Weisberg v. Webster*, 749 F.2d 864, 871 (D.C.Cir. 1984).

make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Thus, if appellants were unable to establish essential elements of their negligence, strict liability and failure to warn claims without offering expert testimony—as the district court held [6]—or some additional evidence, summary judgment was properly granted on those claims.

■ We discuss in turn the necessary elements of each claim under District of Columbia law.[7] We have scant difficulty disposing of appellants' challenge to the district court's holding on the proper make-up of a negligence claim. A manufacturer is liable in negligence for damage caused by his product if he fails to exercise reasonable care in its design. *Westinghouse Elec. Corp. v. Nutt*, 407 A.2d 606, 609 (D.C.App.1979). "What constitutes 'reasonable care' will vary according to the circumstances, and involves 'a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of precaution which would be effective to avoid the harm.'" *Id.* at 610 (quoting 2 Harper & James, *The Law of Torts* § 28.4, 1542 (1956)). *Accord Exum v. General Electric Co.*, 819 F.2d 1158, 1161 (D.C.Cir. 1987). The district court in this case held

that in order to show Eaton acted unreasonably the Hulls needed to establish "the risks inherent in the design employed and in alternative designs, the relative costs of both designs, and the considerations that are taken into account in the design of forklifts." Under the standard set out in *Westinghouse*, this is clearly correct.

■ Appellants raise more substantial questions regarding the elements of their strict liability claim. Relying, to be sure, on section 402A of the Restatement (Second) of Torts,[8] the district court held that to establish strict liability for defective design under D.C. law, the Hulls needed, again, to show the risks, costs and benefits of the product in question and alternative designs. We note at the outset that there is no District of Columbia case clearly setting out the necessary elements of a D.C. strict liability claim. *Compare Fisher v. Sibley Memorial Hospital*, 403 A.2d 1130, 1133 n. 8 (D.C.App.1979) ("this court did not actually adopt 'the theory of strict liability in tort with all its implications'") *with id.* at 1134 (Kelly, J., concurring) ("I think it important to note that in my judgment this court adopted the § 402A theory of strict liability in tort") *and Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712, 722 (D.C.App.1985) (citing section 402A). Our task is thus to choose the rule we believe the District of Columbia is likely to adopt in the future. 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4507, 103 (1982). We have held that when there is no District of Columbia law on point we look to Maryland

---

**6.** The district court held that the plaintiffs' inability to present expert testimony mandated summary judgment on the breach of warranty claim as well, but the court included an alternative holding based on the statute of limitations. Because we agree that the breach of warranty claim is barred by the statute of limitations, *see infra* pp. 455–457, we do not determine the need for additional evidence on this claim.

**7.** The Hulls' complaint alleged Maryland law governed this case, but their opposition to the summary judgment motion relied upon District of Columbia law, and the district court decided the case on that basis. Only in the motion for reconsideration did the Hulls return, tentatively, to their original position—that "Maryland law would most probably apply"—and then only

with respect to the warranty claim. On appeal, there is no disagreement that District of Columbia law governs the other claims.

**8.** Section 402A provides, in pertinent part, that one who

sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability for physical harm thereby caused to the ultimate user ... if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A (1965).

law for guidance. *See Conesco Industries, Inc. v. Conforti and Eisele, Inc., D.C.*, 627 F.2d 312, 315 (D.C.Cir.1980). The Maryland Court of Appeals has adopted section 402A and suggested (although never held) that, in cases such as the one at hand, the "defective condition unreasonably dangerous" language in 402A requires "a balancing of the utility of the design and other factors against the magnitude of that risk." *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955, 959 (1976) (citing *Volkswagen of America v. Young*, 272 Md. 201, 321 A.2d 737 (1974)). *See also Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143, 1149 (1985) (a "risk/utility test" is applied "when something goes wrong with a product"); *Simpson v. Standard Container Co.*, 72 Md.App. 199, 527 A.2d 1337 (Md. App.1987) (discussing risk/utility and "consumer expectation" tests); *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 488 A.2d 516, 519 (1985) (applying risk/utility test where electric saw cut off operator's finger). We believe the District of Columbia would follow the risk/utility balancing test referred to by the Maryland courts. Under that test a manufacturer is strictly liable for damage caused by his product if there was a feasible way to design a safer product and an ordinary consumer would conclude that the manufacturer ought to have used that alternative design. To establish this, a plaintiff must show that the magnitude of the danger from the product outweighed the costs of avoiding the danger—including, for example, any new dangers created and any reduction in the benefits of the product caused by the safer design. *See* W. Keeton, D. Dobbs, R. Keeton & D.

Owen, *Prosser and Keeton on the Law of Torts* § 99, 699–700 (5th ed. 1984). We find no fault, therefore, with the district court's holding as to the proper elements of appellants' strict liability claim.[9]

Finally, with regard to the failure to warn claim, the district court held that appellants needed to show "the basis for determinations of dangerousness and the anticipated likelihood of injury by the product." The Hulls disagree, arguing that the adequacy of a warning is almost always a question for a jury. Appellants are correct as far as they go. *See Payne*, 486 A.2d at 723; *Russell v. G.A.F. Corp.*, 422 A.2d 989, 992 (D.C.App.1980); *Ferebee v. Chevron Chemical Co.*, 552 F.Supp. 1293, 1304 (D.D.C.1982), *aff'd*, 736 F.2d 1529 (D.C.Cir. 1984). They fail to recognize, however, that regardless of whether a failure to warn claim is phrased in terms of negligence or strict liability, there is a threshold question as to whether a duty to warn exists. *Payne*, 486 A.2d at 721. *See also Burch v. Amsterdam Corp.*, 366 A.2d 1079, 1084 (D.C.App.1976). That determination must rest on evidence that the manufacturer "should have known of a danger sufficiently serious to require a warning." *Russell*, 422 A.2d at 992. *See also Young v. Up-Right Scaffolds, Inc.*, 637 F.2d 810, 814 (D.C.Cir.1980) (no duty to warn if risk not reasonably foreseeable). *See generally Prosser* § 99; 1A L. Fumer & M. Friedman, *Products Liability* § 8.03[1] (1986). Before the *Russell* and *Ferebee* courts reached the question of the adequacy of the warnings, plaintiffs had introduced evidence—through expert testimony on the probability and gravity of the particular

---

9. "The views of a district judge [in a diversity case] who is a resident of the state where the controversy arose interpretive of the state's laws, carry extraordinary force on appeal where there are no state decisions directly on point or none which provide a clear precedent." *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1148 (10th Cir.1978) (bracketed material in original). *See also Harville v. Anchor-Wate Co.*, 663 F.2d 598, 602 (5th Cir.1981) ("Only when the district court's view of applicable state law is 'against the more cogent reasoning of the best and most widespread authority' should this court reverse the judg-

ment of the lower court"); *Worthen Bank & Trust Co. v. Morris (In re Morris)*, 602 F.2d 826, 829 (8th Cir.1979) ("The District Court is entitled to deference on matters of the law of the state where it sits"); *Kalmich v. Bruno*, 553 F.2d 549, 552 (7th Cir.1977) ("reviewing court will not reverse a determination on the part of a federal district court judge of the local law of his state unless there is a firm conviction that it was clearly erroneous"). Application of this principle seems particularly appropriate here, where the district judge spent many years as a judge in the District of Columbia court system and therefore has added expertise in local law.

risks—giving rise to an inference that the risk was both foreseeable and sufficiently serious that a duty to warn existed. *See Russell,* 422 A.2d at 992; *Ferebee,* 736 F.2d at 1538.[10]

### B.

Having determined the district court correctly set out elements of the negligence, strict liability and failure to warn claims, we now discuss whether appellants offered sufficient evidence to create a genuine issue of fact as to those elements. The district court granted summary judgment because appellants lacked expert testimony on the dangers of the forklift and the consequences and trade-offs of alternative designs. We agree, of course, that with respect to some matters expert testimony is more than advantageous—it is required. *See Simpson v. Chesapeake & Potomac Tel. Co.,* 522 A.2d 880, 884–85 (D.C.App. 1987); *District of Columbia v. Freeman,* 477 A.2d 713, 719 (D.C.App.1984); *District of Columbia v. White,* 442 A.2d 159, 164 (D.C.App.1982); *Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.App. 1981). *See also Washington Hosp. Center v. Butler,* 384 F.2d 331, 336–37 (D.C.Cir. 1967). "Expert testimony is required when the subject presented is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" *White,* 442 A.2d at 164 (quoting *Hughes,* 425 A.2d at 1303). But we need not hold that the risks and benefits of different product designs can be established *only* by expert testimony in order to affirm the grant of summary judgment. Rather, we can properly resolve this case by holding that the evidence appellants *did* proffer was insufficient as a matter of law. *See Sledd v. WMATA,* 439 A.2d 464, 468 (D.C.App.1981). The Hulls direct our attention to only three pieces of evidence.

■ First, the Hulls point to the undisputed fact that Mr. Hull's accident occurred. Unfortunate as it was, however, the accident alone reveals neither whether the accident was foreseeable, nor the likelihood that the risk would manifest itself, nor whether the risk outweighed the costs of avoiding it. Second, the Hulls established that Eaton manufactured a previous forklift model, the K–58, on which the counterweight bolts were plainly visible. The Hulls argue, as we noted, that visible bolts make accidents such as the one that befell Mr. Hull less likely to occur. But evidence that one alternative design was technically feasible, and perhaps safer, proves nothing with regard to the actual risk of the chosen design, nor the relative utilities of the alternative designs, nor the costs involved in adopting one design over the other. "[E]vidence of a design alternative, by itself, is not sufficient to impose liability on the manufacturer." *Westinghouse Elec. Corp. v. Nutt,* 407 A.2d at 611. *Cf. Exum,* at 1161 (reversing directed verdict on claim that french fryer was negligently designed, even though plaintiff lacked qualified expert, because defendant admitted in an interrogatory that it marketed a protective device at a price of less than $100). Finally, the Hulls direct us to a pretrial deposition of Eaton's designated expert, Paul Knebels. The Knebels deposition, however, establishes no more than the existence of this K–58 design. Absent further evidence, we believe, a jury could only speculate on the ultimate issues on which summary judgment was granted—whether Eaton ought to have selected a safer design for the forklift (because, phrased in negligence terms, a reasonable manufacturer would have done so, or, phrased in strict liability terms, the danger exceeded the cost of avoiding the danger) and whether Eaton had a duty to warn of the dangers in the chosen design. The Hulls were therefore unable to establish essential elements of their strict liability, negligence and failure to warn claims, and summary judgment was properly granted on those claims.

### C.

■ Although the district court held that the absence of expert testimony was fatal

---

**10.** The court in *Payne* relied on a factually-similar previous case to establish that the particular risk gave rise to a duty to warn. *Payne,* 486 A.2d at 721–22.

to the plaintiffs' breach of warranty claim, it also held that this claim was barred by the statute of limitations. *See supra* note 6. The parties agree that the statute of limitations is four years under both District of Columbia and Maryland law, as provided in Uniform Commercial Code § 2–725. *See* D.C.Code Ann. § 28:2–725; Md.Com.Law Code Ann. § 2–725.[11] The disagreement concerns the point at which the statute of limitations began to run. Giant purchased the forklift from YIT in February, 1978. Hull's accident occurred on January 14, 1980. Appellants filed their complaint on January 13, 1983, approximately four years and ten months after Giant took delivery of the forklift. The district court held that, under District of Columbia law, the plaintiffs' cause of action accrued when the breach of warranty took place—in February, 1978, when YIT delivered the forklift to Giant. Appellants argue, instead, that Maryland law governs the warranty claim, and that Maryland applies the "discovery rule"—under which a cause of action accrues when the plaintiff knows or reasonably should know of his injury. Assuming *arguendo* that Maryland law governs appellants' substantive claim, *see supra* note 7, we believe nonetheless that the district court correctly applied the District of Columbia statute of limitations. The district court, as a federal court sitting in a diversity case, was required to look to state law for the applicable statute of limitations. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The District of Columbia is the forum "state," *see Lee v. Flintkote Co.*, 593 F.2d 1275, 1278 n. 14 (D.C.Cir.1979); *Conesco*, 627 F.2d at 315; *Steorts v. American Airlines, Inc.*, 647 F.2d 194, 196 (D.C.Cir.1981), and thus a federal court should apply whatever statute of limitations the District of Colum-

bia would apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). It is reasonably clear that the District of Columbia would apply its own statute of limitations. *See Hodge v. Southern Railway Co.*, 415 A.2d 543, 544 (D.C.App.1980); *May Department Stores Co. v. Devercelli*, 314 A.2d 767, 773 (D.C.App.1973). In the one hundred pages of briefs appellants presented to this court, we discern no argument to the contrary.

■ The Hulls contend in the alternative that even under the District of Columbia statute of limitations the discovery rule applies to a claim for breach of contract under the U.C.C. Appellants cite a recent case in which the District of Columbia Court of Appeals applied the discovery rule to "an action based upon tort and contract claims arising out of allegedly deficient design and construction of an addition to a house." *Ehrenhaft v. Malcom Price, Inc.*, 483 A.2d 1192, 1203 (D.C.App.1984).[12] The court in *Ehrenhaft* observed that "it is inconsistent with our notions of justice to interpret the 'accrual' of a cause of action to occur prior to a point in time at which a person would reasonably have knowledge of any wrongdoing," *id.* at 1202, but concluded that it would "not reach so far as to apply the rule to all cases." *Id.* at 1204. However, the statute of limitations for the contract claim in *Ehrenhaft* left the term "accrual" undefined, whereas here the statute is explicit: "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." D.C.Code Ann. § 28:2–725(2) (1981). Given the clear words of the statute, and the absence of controlling authority to the contrary, in light of our deference to the district judge's knowledge of local law we conclude the district court was correct in holding that the discovery rule is

11. Section 2–725 provides in relevant part:
   (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.…
   (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except where a warranty explicitly extends to future performance of the goods and

discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
Appellants do not claim that the alleged warranty explicitly extended to future performance.

12. The *Ehrenhaft* court did not consider warranties arising under the Uniform Commercial Code.

not applicable to the Hull's breach of warranty claim. We recognize that the District of Columbia may decide in the future to extend the discovery rule to a claim of this sort; we hold only that as of today the rule does not reach so far. *See Woodruff v. McConkey,* 524 A.2d 722, 727 (D.C.App. 1987) ("The discovery rule thus far has been applied by this court only in cases involving professional negligence or malpractice....").

## IV.

■ Finally, the Hulls contend that the district court erred in dismissing their claim that Eaton was vicariously liable for YIT's negligent installation of the 3000 pound counterweight.[13] The district court examined the Dealer Selling Agreement between Eaton and YIT to determine whether it indicated an agency relationship. Although the agreement required YIT to provide service on Eaton forklifts, to advertise itself as a dealer of Eaton's products, to furnish information, and to conform to any business standards recommended by Eaton,[14] the court found that nothing in the agreement or in any other evidence that suggested day-to-day control of YIT's operation. It found that such control was essential, however, if Eaton was to be held vicariously liable.

We think that the district court was correct. In *Quijada Corp. v. General Motors Corp.,* 253 A.2d 538 (D.C.App.1969), the court considered whether General Motors could be liable for the negligent repairs of GM bus distributors. The court stated the existence of an agency relationship must be decided on the facts of each case, but that "the determining factor is the corporation's right to control the day-to-day operations of the distributor." *Id.* at 540. The distributorship agreements required distributors to make sale and inventory reports, provide financial statements, provide GM signs as advertising, send employees to GM training school, maintain customary business hours, and obtain GM's consent before changing locations. *Id.* Even though this agreement gave some indicia of control, the court found that such factors as the distributors' freedom to do their own hiring and firing, to ignore GM representatives' suggestions, and to refuse to follow GM repair manuals supported the lower court's finding that the distributors were independent contractors, rather than agents. Similarly, in *B.P. Oil Corp. v. Mabe,* 279 Md. 632, 370 A.2d 554 (1977), the court found that an oil company did not sufficiently control operations of a service station to establish an agency relationship, and therefore refused to hold the oil company vicariously liable for the station's negligence. *See also Shear v. Motel Management Corp. of America,* 61 Md.App. 670, 487 A.2d 1240, 1248–49 (1985) (finding no agency relationship between Holiday Inn Hotel chain and franchisee despite certain indicia of control,

**13.** The Hulls argue that there is a factual issue as to who installed the 3000 pound counterweight. There seems to be no dispute, however, that when Eaton delivered the forklift to YIT in December, 1977, it had a 2500 pound counterweight. The evidence appellants cite—(1) YIT's December 28, 1977 letter to Giant, and accompanying documents, offering to sell the forklift; (2) YIT's February 16, 1978 "Unit Transfer Form," which recorded YIT's delivery of the forklift to Giant; and (3) YIT's February 28, 1978 request to Eaton for a new capacity plate to reflect an increase in lifting capacity to 3000 pounds—creates an issue only as to whether it was YIT or Giant that changed the counterweight. Plaintiffs do not argue an agency relationship between Eaton and Giant. Accordingly, we interpret the record most favorably to plaintiffs and assume YIT installed the new counterweight.

**14.** The Dealer Selling Agreement between YIT and Eaton states:

To be in good standing, an authorized [Eaton] dealership shall:

. . . . .

g. adopt and appropriately apply objective standards of business procedure, operation and administrative practice recommended by [Eaton] for application to all authorized [Eaton] dealerships (such standards will be based on objective periodic evaluation of the operations, and operating results of authorized [Eaton] dealers as a group, and will be published from time to time in a Dealer Operations and Policy Manual).

The standards themselves are not contained in the record, but the affidavit of YIT's service manager, Charles L. Poole, gives some indication of their content in stating, "There were no mandatory requirements set forth by Eaton to govern the way that the dealership was run. Service or operations manuals contained guidelines, but we were not obligated to follow those suggestions."

including a requirement of conformity to Holiday Inn standards); *Arnson v. General Motors Corp.,* 377 F.Supp. 209, 212 (N.D.Ohio 1974) (finding insufficient control by auto manufacturer over dealer to justify liability, and listing cases finding franchised auto dealers to be independent contractors rather than agents). We find *Quijada* and *B.P. Oil Corp.* to be analogous to the instant case. YIT made its own hiring and firing decisions, set its own business hours, and sold equipment manufactured by other manufacturers than Eaton. Apart from a few general guidelines on business practices, YIT had complete control of its operations. The lack of day-to-day control by Eaton of YIT precludes a finding of agency.

Appellants rely on *Caporale v. Raleigh Industries of America, Inc.,* 382 So.2d 849 (Fla.App.1980), but this case is distinguishable. In *Caporale,* the plaintiffs sued a manufacturer and a retailer for injuries suffered in a bicycle accident allegedly caused by a misassembled "quick-release" mechanism. The court found that the retailer was not an independent contractor because the manufacturer knowingly relied on the retailer to assemble its bicycles. In the instant case, by contrast, Eaton assembled the forklift prior to delivery to YIT. Any further changes were modifications by YIT. Accordingly, the district court properly dismissed the Hulls' vicarious liability claim.

## V.

We conclude that (1) the district court did not abuse its discretion in imposing the discovery sanction; (2) the court properly granted summary judgment because without additional evidence the Hulls were unable to establish a case of negligence, strict liability or failure to warn; (3) the court properly refused to apply the "discovery rule" to the breach of warranty claim; and (4) Eaton cannot be held liable for the acts of YIT. Accordingly, the judgment of the district court is

*Affirmed.*