**INGALLS SHIPBUILDING, INC.,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES,**
**Defendant–Appellant.**

No. 88–1203.

United States Court of Appeals,
Federal Circuit.

Sept. 29, 1988.

David V. Anthony, Pettit & Martin, Washington, D.C., argued for plaintiff-ap-

pellee. With him on the brief were Gregory A. Smith, Paul C. Fuener and Maryanne R. Lavan. Also on the brief were Norman L. Roberts, William J. Powers, Jr. and N. French Caldwell, Ingalls Shipbuilding, Inc., Pascagoula, Miss.

Helene M. Goldberg, Senior Trial Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Michael F. Hertz, Directors and Robert L. Ashbaugh, Deputy Director.

Before ARCHER and MAYER, Circuit Judges, and BALDWIN, Senior Circuit Judge.

MAYER, Circuit Judge.

### OPINION

This is an appeal from a decision of the United States Claims Court, 13 Cl.Ct. 757 (1987), which, as a discovery sanction under RUSCC 37(b)(2)(A), precluded the government from introducing any evidence that the Ingalls Shipbuilding Division of Litton Systems, Inc. (Litton) engaged in fraud in establishing its claim for an equitable adjustment on its government contract to construct nuclear submarines, and entered judgment for Litton. We reverse.

### Background

This case has a long and complex history which began in 1968 when Litton and the United States Navy entered into a contract to construct three nuclear attack submarines. In 1970, Litton submitted a claim to the government contracting officer seeking approximately $34 million for additional costs allegedly incurred as a result of government delays. The contracting officer issued a decision that awarded Litton a $3.8 million equitable adjustment, but denied the remainder of its claim. Litton then appealed to the Armed Services Board of Contract Appeals (ASBCA), which, after a sixty-nine day trial, awarded Litton a $17,361,586 equitable adjustment. *Ingalls Shipbuilding Div., Litton Sys., Inc.,* 76–1

BCA ¶ 11,851 (ASBCA 1976). Pursuant to an agreement between Litton and the government, the full amount of the ASBCA award was conditionally paid to Litton pending review in the Claims Court,* as permitted by *S & E Contractors, Inc. v. United States*, 406 U.S. 1, 15, 92 S.Ct. 1411, 1419, 31 L.Ed.2d 658 (1972).

Soon thereafter, the government began a series of grand jury investigations into Litton's claim. On April 6, 1977, a grand jury indicted Litton on one count of submitting a false claim. The same day, Litton filed suit in the Claims Court seeking enforcement of the ASBCA award. In response, the government filed a counterclaim and special plea in fraud, arguing that the ASBCA award was subject to forfeiture under 28 U.S.C. § 2514.

Litton then submitted a set of interrogatories to secure specific information about the government's fraud allegations. The government timely responded to the interrogatories, but its answers were deemed inadequate by Litton. Accordingly, Litton moved for discovery sanctions or, in the alternative, to compel the government to respond more fully. In a one-sentence order, the Claims Court ruled that Litton's motion was "allowed as to the second alternative."

Shortly thereafter, the civil action in the Claims Court was stayed pending resolution of the criminal proceedings. The criminal case was dismissed for prosecutorial misconduct by the District Court for the Eastern District of Virginia, but on appeal, that decision was reversed. *United States v. Litton Sys., Inc.*, 573 F.2d 195 (4th Cir. 1978). Following remand and transfer to the District Court for the Southern District of Mississippi, the case was dismissed for failure to prosecute because of a five-year delay following indictment. That decision was reversed on appeal as well. *United States v. Litton Sys., Inc.*, 722 F.2d 264 (5th Cir.1984).

* The early proceedings in this case were in the Court of Claims which was succeeded by the Claims Court on October 1, 1982. Federal Courts Improvement Act, Pub.L. No. 97–164, Tit.

The criminal trial proceeded, and in December 1984, Litton was found not guilty of criminal fraud. Following the acquittal, the government requested additional time to decide whether it would continue to defend against enforcement of the ASBCA award in this case. After an eight-month review of the evidence, the government elected to proceed.

On August 1, 1985, a status conference was held before the Claims Court. Principal among the matters discussed was the government's still outstanding interrogatory answers. In response to questioning by the court, Litton acknowledged that it had obtained much of the government's evidence of fraud during the criminal trial. Further, it said that it doubted "discovery would be extensive in any sense," and that it did not want the government to provide any information that it already had. On the other hand, Litton expressly said it wanted the government to provide it with certain information, particularly about the alleged fraud before the ASBCA. Litton asked the court to require the government to comply with the 1977 order compelling it to respond more fully to Litton's interrogatories. The court observed that when the civil proceedings were reactivated the order to compel discovery went "into effect by its own force;" it issued an order, dated August 9, 1985, stating that by September 4, 1985, the government was required to provide more complete responses to the nine interrogatories that were the subject of the 1977 order.

The government filed a set of supplemental answers to the interrogatories, but Litton again found them inadequate, and filed a motion for sanctions under RUSCC 37(b)(2)(A). It also argued that the Claims Court had no jurisdiction over the government's counterclaim and special plea in fraud, and that because the civil fraud statute was punitive, the trial of the civil case would result in double jeopardy.

I, § 105, 96 Stat. 27 (1982). However, for convenience we refer to the Claims Court throughout.

The court rejected the jurisdictional challenge and did not reach the constitutional argument, but it granted Litton's motion for sanctions. According to the court, the government's interrogatory answers were overly broad, evasive and incomplete. "The interrogatories in question here were designed to find out exactly what the fraud was.... It is clear then that when allegations of fraud are in the air the alleging party has a duty to inform the opposing party of the exact actions which are allegedly fraudulent. This requirement is not satisfied by broad assertions that all is fraudulent; rather, specific facts must be averred so that the allegedly fraudulent party can present facts to deal with these charges." 13 Cl.Ct. at 768–69.

The Claims Court determined that the government's inadequate discovery responses were not due to "personal contumacious behavior by ... counsel," and it found no evidence that "the government had material indicating fraud and didn't provide it." Instead, the court faulted the government for "attempt[ing] to present a case of fraud where evidence for that case clearly does not exist." In the court's view, there was a "basic lack of any foundation for [the government's] claim other than institutional momentum." *Id.* at 769.

As a sanction, the court precluded the government from proving any of its claims of fraud. This was tantamount to dismissal because fraud was the government's only defense to the finality of the ASBCA decision. Accordingly, the court entered judgment in favor of Litton for $17,361,-586.

### Discussion

#### A.

"Delay and excessive expense now characterize a large percentage of all civil litigation. The problems arise in significant part, as every judge and litigator knows, from abuse of the discovery procedures available under the [Federal] Rules." 446 U.S. 995, 999 (1980) (Powell, J., dissenting from adoption of amendments to the Federal Rules of Civil Procedure). To combat abuse of the discovery system, RUSCC 37, which parallels Fed.R.Civ.P. 37, provides the Claims Court with an arsenal of discovery sanctions designed to discourage dilatory practices and encourage full disclosure of relevant information prior to trial. RUSCC 37 in pertinent part provides:

(2) *Sanctions against a party.* If a party ... fails to obey an order to provide or permit discovery ... the court may make such orders in regard to the failure as are just and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings unless the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

. . . .

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorneys' fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The decision whether to impose discovery sanctions rests within the sound discretion of the trial court. *Adkins v. United States*, 816 F.2d 1580, 1581 (Fed.Cir.1987); *see Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed.Cir.1986). Accordingly, when reviewing a decision ordering sanctions the question is not whether we "would as an original matter" have

imposed the sanction but "whether the [Trial] Court abused its discretion in so doing." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1261 (Fed.Cir. 1985).

But a trial court's discretion to impose sanctions is not unfettered, especially when the de facto result of the sanction is dismissal. The Supreme Court has said that "there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Societe Internationale v. Rogers*, 357 U.S. 197, 209, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958). "There is a strong policy favoring a trial on the merits and against depriving a party of his day in court." *Fox v. Studebaker–Worthington, Inc.*, 516 F.2d 989, 996 (8th Cir.1975). Accordingly, "dismissal is a drastic action to be used only when clearly authorized...." *Mancon Liquidating Corp. v. United States*, 210 Ct.Cl. 695, 696 (1976); *see Thomas v. United States*, 531 F.2d 746, 749 (5th Cir.1976).

### B.

The harsh remedy of de facto dismissal is appropriate where the failure to comply with a pretrial discovery order is due to "willfulness, bad faith, or ... fault" on the part of a litigant. *Societe Internationale*, 357 U.S. at 212, 78 S.Ct. at 1095–96; *see also National Hockey League*, 427 U.S. at 643, 96 S.Ct. at 2781 (dismissal under Rule 37 justified where there was "flagrant bad faith" and counsel displayed "callous disregard" of their responsibilities); *Mancon*, 210 Ct.Cl. at 696 (sanctions not warranted where there was no evidence of willfulness). Here, however, the court did not find that the government willfully abused the discovery process. To the contrary, it said that the failure to comply with the discovery order was "not an action of personal contumacious behavior by ... counsel," and that the government had not failed to provide any information in its possession. It imposed sanctions "not because

I think that willfulness was there in the sense that the government had material indicating fraud and didn't provide it. I think the willfulness was there [in] the government continuing to bring a case when in fact the evidence of fraud didn't exist."

As we see it then, the court meted out a sanction tantamount to dismissal not because of any willful failure to answer Litton's interrogatories, but because of the government's continued pursuit of a case the court felt had no merit. Discovery sanctions, however, are meant to deter intentional abuse of the discovery process, not as a means to resolve the merits of a case. *See Societe Internationale*, 357 U.S. at 213, 78 S.Ct. at 1096; *Kropp v. Ziebarth*, 557 F.2d 142, 147 (8th Cir.1977). Where the problem is a perceived inadequacy of proof, not the failure to provide it, dismissal as a sanction under Rule 37 is not warranted. *See Kropp*, 557 F.2d at 147.

We also think the sanction is inappropriate because the government was, perhaps understandably, confused about the scope of its discovery obligations. "[A] party's simple negligence, grounded in confusion or sincere misunderstanding of the Court's orders, [does not] warrant dismissal." *Marshall v. Segona*, 621 F.2d 763, 768 (5th Cir.1980); *see Equal Employment Opportunity Comm'n v. Troy State Univ.*, 693 F.2d 1353, 1357 (11th Cir.1982); *United Artists Corp. v. Freeman*, 605 F.2d 854, 856–57 (5th Cir.1979). In 1977, the Claims Court granted Litton's motion to compel further discovery by a one-phrase order, but it did not identify the deficiencies in the government's earlier interrogatory answers. This order came before the criminal case was tried during which Litton was provided full access to the grand jury files and witnessed first-hand the presentation of the government's case. Given the enormous volume of information Litton got through the criminal trial, the government says it was uncertain of the scope of its discovery obligations when this case resumed in 1985.

The 1985 status conference before the Claims Court gave the government little

insight into the alleged deficiencies in its earlier answers to interrogatories. The court set a date for submission of the government's answers, but it did not set out the deficiencies it saw in what had previously been filed. So the government was never given a clear statement by the court about its view on the alleged deficiencies in its earlier answers.** In view of the government's apparent confusion about the scope of its additional discovery obligation, we see the sanction of dismissal as unduly severe. *Cf. Equal Employment Opportunity Comm'n*, 693 F.2d at 1357 (dismissal unwarranted where party's "confusion concerning ... court orders provide[d] a feasible explanation" for its failure to comply fully with discovery requests).

Furthermore, when the government submitted its 1985 interrogatory answers it was not unreasonable to have believed that Litton already had obtained the bulk of the relevant evidence. *See* Transcript of August 1, 1985 Status Call before the United States Claims Court at 3–4. In fact, at the August 1985 status conference, the last conference before the government submitted its responses, there seemed to be a general consensus that Litton had gained much of the evidence it needed during the criminal trial. Speaking to Litton's counsel, the court said:

> You have the transcript of the trial and you were there. *Trials tend to be discovery too.* I mean, you have this proceeding [the criminal trial]. You probably have the government's best shot on a lot of these points.

*Id.* at 18 (emphasis added). Litton's counsel responded:

> I would be inclined to agree with much of that except for one thing. The Government, in this case, alleges fraud before the Armed Services Board of Contract Appeals. That issue was not involved in the criminal case.... *Aside*

*from that, it may be.... So, you're perfectly right.* Some of that stuff has come out in the criminal case.

*Id.* (emphasis added). To be sure, Litton announced at the conference that it wanted more information, particularly about the basis for the government's allegation of fraud before the ASBCA. And it was entitled to have that information, presented in a clear, concise and complete manner. But we think it was inappropriate to impose this sanction when both Litton and the court appeared to agree that Litton already had most of what it needed. *Cf. Mancon*, 210 Ct.Cl. at 696; *Farmers Plant Food v. Fisher*, 746 F.2d 451, 452 n. 1 (8th Cir. 1984). Indeed, Litton explicitly stated at the status conference that it did not want the government to provide it "any additional evidence that [it] already had...."

On appeal, Litton argues: "The fact that a party propounding interrogatories may already have access to the [relevant information] does not relieve the other party of the obligation to answer the interrogatories." It complains further that even if it already knew "both the specifics of the Government's civil case as well as the proof upon which it intend[ed] to rely, the Government [was] nevertheless obligated to answer interrogatories seeking that information." Litton is correct as a general proposition. But given its professed desire to avoid duplication of evidence, we can hardly fault the government for failing to produce evidence that was previously provided during the criminal trial, a complete record of which Litton possessed.

Moreover, we do not see any real prejudice. *See Marshall*, 621 F.2d at 769; *Wilson v. Volkswagon*, 561 F.2d 494, 505 (4th Cir.1977); *Edgar v. Slaughter*, 548 F.2d 770, 773 (8th Cir.1977); *Fox*, 516 F.2d at 996. By order of the court, discovery remained open at the time sanctions were requested, which Litton was free to pursue.

---

** We cannot accept Litton's assertion that its 1977 motion to compel more complete interrogatory responses provided the government with an adequate explanation of the alleged deficiencies. The one-phrase order allowing the motion gave no hint of the extent to which the court agreed with the deficiencies alleged by Litton.

The order was issued prior to Litton's acquisition of the entire grand jury investigatory files and its observation of the government's witnesses during the criminal trial. The 1977 motion did not inform the government about the scope of its discovery obligations in 1985.

In fact, at the status conference Litton said it intended to conduct additional discovery beyond the answers to the interrogatories:

> [LITTON]: But at the present time, we're thinking in terms of looking for discovery, which will not be extensive.
>
> . . . .
>
> THE COURT: The responses to the nine interrogatories, you view as different from discovery in general. Do you need those to file your motions?
>
> [LITTON]: Well, Your Honor, those nine interrogatories will go a long way in answering discovery, yes. *My statement is, yes, we probably need additional discovery beyond the answer to the nine interrogatories.* But I don't want to overstate the discovery need....

Transcript of August 1, 1985 Status Call before the United States Claims Court at 19 (emphasis added). Litton apparently viewed discovery as a continuing process whereby the government would initially provide information about its allegations of fraud via its amended answer and interrogatory responses. But Litton reserved the right to seek supplemental discovery if it was not satisfied with the information the government provided. In our view, it was at least premature for the Claims Court to impose the sanction.

### C.

Nor do we take as dim a view of the government's interrogatory answers as Litton does. The interrogatories generally seek information on two subjects: the basis for the government's allegations of fraud before the contracting officer, and the basis for its claim of fraud before the ASBCA. The government's responses are far from exemplary, but in our view they provide at least partially adequate answers directed to both of these questions which it not improbably could have thought sufficient in light of the discussion at the status conference.

Litton says that interrogatory 28 was the "single most important interrogatory at issue." That one asks the government to identify which of the ASBCA's 170 findings of fact are based on fraud. In response, the government said that the "whole" board proceeding was tainted by the underlying fraud in Litton's claim to the contracting officer. The government explained:

> The defendant contends that the "whole" [of the ASBCA proceeding] was tainted by fraud. Once the decision making process had been set askew by fraud and misrepresentations, the entire proceeding is open to question. The entire chain of events which began on November 23, 1970 with the submission of the [claim for an equitable adjustment to the contracting officer] consists of blocks of logic, each the foundation for subsequent findings or inferences. If the initial block is infirm, all else crumbles and is open to question. It is impossible to evaluate the situation piecemeal since the Government questions the initial premise. The Government's steel deliveries in no way influenced adversely Ingalls performance on the 680 contract.

The government cannot be faulted for not identifying the specific parts of the ASBCA proceedings that were fraudulent when its basic theory is that the fraud occurred with the contracting officer, before the ASBCA proceedings even took place. This may or may not be viable as a legal theory or supported by the facts. We are not now asked to decide. But it provides a clear statement of the government's position. We do not see the government's response as a reason to impose discovery sanctions.

This does not mean, however, that the government can profit from its failure to respond more specifically. *See, e.g., Dellums v. Powell,* 566 F.2d 216, 235 (D.C.Cir. 1977); *Kropp,* 557 F.2d at 147. Its failure, for example, to identify with particularity any severable portion of the ASBCA proceeding that was tainted by fraud, may well preclude it from reversing field and attempting to prove specific instances now. But this is not a reason to foreclose the government from establishing and proving, if it can, its theory that fraud before the contracting officer was sufficient to taint the ASBCA proceeding, a claim that was

clearly and concisely set out in the interrogatory answers.

We also do not fully agree that the government's answers to the remaining interrogatories provided only vague descriptions of the fraud allegedly practiced before the contracting officer. Attachment A of the interrogatory answers provides a detailed description of the way in which Litton allegedly tried to charge the government for delays not its fault. Attachment A lists 18 documents and indicates the particular part of each document the government believes to be fraudulent. For example, about a graph on which Litton premised its claim, the government asserted that:

> This graph was not prepared in November 1969, contrary to the date upon it and text on the preceding page. No graph similar to the one on page 39 was prepared in November 1969 or in any approximate period of time close thereto. Material omissions were made in the preparation of the graph in 1970 to make the graph consistent with the claim theory and text and the graph is inconsistent with data in existence in the shipyard in November 1969. The curves are not the result of plotting actual data but were prepared directly for the purpose of supporting the Litton 1970 claim.

Similarly, referring to Litton's November 23, 1970 claim for an equitable adjustment, the government answered: "Contrary to the suggestion in the claim, Litton knew well before July/August 1968 that it was unlikely the Navy would be able to support an August 5, 1968 start fabrication date." Furthermore, it disputed Litton's claim that the government's change in delivery dates created insurmountable manpower problems, stating, "The commercial chemical tanker contract was sought completely independent of the submarine program and was not sought to 'alleviate the 1000 man dip in the direct labor' as suggested in the narrative and graph." In addition, the government said that Litton's Hull Area Erection Schedule, "was represented by Litton in its claim as a working schedule, when in fact Litton knew it was nothing but a study which was abandoned shortly after it was created...."

Attachment A continues for more than twenty pages with a detailed list of documents and statements that the government believes to be fraudulent. When combined with the enormous volume of information received during the criminal trial, it paints a fairly detailed picture of the government's allegations of fraud before the contracting officer. Whether the evidence is sufficient or not for the government to prove its case, neither we nor the Claims Court have occasion to decide on a motion for sanctions.

### D.

We do not want to imply that we condone the government's conduct in this case. As the Claims Court well recognized, the government's interrogatory answers are inadequate in many ways. Some are incomplete. For example, the government said that it would rely on 136 documents to prove its case of fraud, but Attachment A only identifies the fraudulent portion of 18 documents. Other responses are overly broad. When asked to provide the proof upon which its allegations were based, the government cited the bulk of the documents used in the criminal proceedings and most of the testimony obtained before the district court and the ASBCA. It must narrow its responses sufficiently to inform Litton of the evidence that forms the core of its case. Moreover, in the face of the government's disavowal of any equivalence between the civil and criminal proceedings, it should specifically inform Litton of the ways in which its civil case would differ from the criminal one.

This is an unusual case as the procedural history shows and, as the trial court quipped, it is beginning to look like *Jarndyce v. Jarndyce* from Dickens' Bleak House. In view of its apparent interminability, the court can be excused its impatience with continuing deficiencies in and disputes over discovery when by now one would have thought the parties would know all they are going to know about this case. But by court order, discovery was

continuing; the court and the parties were not of one mind about the status and deficiencies of discovery; and the court had never been asked to specially pass on the government's complained-of failures when there was still the chance to bring about mutual understanding, if not agreement, about what the government had done acceptably and what it still needed to do to satisfy its discovery obligation. *See Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1459 n. 15 (D.C.Cir. 1986); *cf. Hull v. Eaton Corp.*, 825 F.2d 448, 451, 452 (D.C.Cir.1987). It only learned of the court's opinion of the situation when the ultimate sanction was imposed without further opportunity for redemption.

In the circumstances here, there needed to be a predicate "warning" order, ideally after conferring with the parties, setting out the deficiencies the court saw and giving the government the chance to comply, as the court would have had every reason to expect it would in view of the determination that the government was not guilty of any bad faith or contumacious behavior. The litigants would then be on notice by court order of what was expected, and failure to comply would be sufficient basis for imposition of a sanction under RUSCC 37. By skipping this step, the government was deprived of both notice and its case, which we cannot let stand.

### Conclusion

Accordingly, we reverse the judgment and remand for further proceedings.

### Costs

The government will bear the costs of this appeal.

REVERSED AND REMANDED.

BALDWIN, Senior Circuit Judge, dissenting.

I disagree with the result reached by the majority, and therefore respectfully dissent.

As the Supreme Court stated in *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976), "[t]he question, of course, is not whether this Court * * * would as an original matter have dismissed the action; it is whether the [Claims] Court abused its discretion in so doing." Here, as in *National Hockey*, there was ample support in the record for the learned trial judge's findings. After many years of litigation and extensive time for the government to identify the facts upon which it intended to rely, the trial judge rightfully inferred bad faith from the government's terribly inadequate interrogatory answers. The most blatant example of the government's noncompliance came in response to interrogatory number 16. That interrogatory requested the government to identify those parts of the proceedings before the Armed Services Board of Contract Appeals (ASBCA) upon which the government would rely. The response of "the whole proceeding," the records of which exceed ten thousand pages in testimony alone, is sorely deficient.

As the majority points out, the trial judge did not believe that government counsel had acted "contumaciously." 13 Cl.Ct. at 716. However, such stubborn disobedience is not a necessary predicate to the imposition of sanctions under rule 37. It is enough that there was "fault" or "bad faith" on the government's part. *Societe Internationale v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095–96, 2 L.Ed.2d 1255 (1958). The record amply supports the trial judge's finding that the government's failure to answer the interrogatories was not a good faith action. The fact that the trial judge believed the government's failure intimated it lacked the requisite evidence to proceed on its fraud defenses and counterclaims does not alter the findings. Rather, they act to support those findings. The trial judge noted, "[i]f the government had particular facts available to it, it would, if it were operating on established notions of good faith, disclose them in compliance with the spirit of the discovery process." 13 Cl.Ct. at 773. Thus, the judge surmised that the government's actions were taken in bad faith not because it was deliberately hiding evidence,

but because government counsel could not point to anything upon which it could rely to support its fraud allegations. This, the trial judge felt, constituted a waste of judicial resources and an abuse of the discovery process. The bad faith that was inferred was in the government's unwillingness to fish or cut bait.

Bad faith has long been recognized as sufficient grounds to impose sanctions under rule 37. *See Societe International,* supra. We, as a reviewing court, should not replace the trial court and succumb to pleas for leniency such as that made here. The Supreme Court, in *National Hockey,* 427 U.S. at 642–43, 96 S.Ct. at 2780–81, warned against courts of appeals substituting their judgment for those of the trial court in situations like this:

> There is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order. It is quite reasonable to conclude that a party who has been subjected to such an order will feel duly chastened, so that even though he succeeds in having the order reversed on appeal he will nonetheless comply promptly with future discovery orders of the district court.

But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent. If the decision of the Court of Appeals remained undisturbed in this case, it might well be that *these* respondents would faithfully comply with all future discovery orders entered by the District Court in this case. But other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts.

I believe this case is an example of what the Supreme Court cautioned against.

Secondly, I cannot agree that the government was confused about the scope of its discovery obligations or if it was, that this is grounds for reversal. *Ante* at 1451. At the status conference from which the second order to comply was issued government counsel had ample opportunity and time to inform the court that it could not answer the interrogatories without guidance from the court. Instead, counsel merely asserted that it would take a little longer than originally thought to answer the interrogatories due to institutional drift and changes in personnel.

At one point in the status hearing government counsel specifically requested that Litton "identify the nine interrogatories we're talking about so we don't have a misunderstanding." Government counsel did not request Litton, or the court, to identify specific deficiencies in the government's answers. While a party should not always be required to request such an explanation, from the colloquy at the status conference, there was no indication by the government that compliance with the order to answer would not be possible for any reason, let alone because the government required guidance. The government cannot now justify all of its flagrant disregard for the discovery process through a simple plea of ignorance. If government counsel was confused, it needed only to come into court and request the guidance it now says excuses its responses.

Finally, the trial court's failure to warn government counsel that a sanction tantamount to dismissal would follow noncompliance was not, and should not be held, necessary. Government counsel are experienced litigators familiar with the federal rules, and the rules of the United States Claims Court. The opinions cited by the majority, *Hull v. Eaton Corp.,* 825 F.2d 448 (D.C.Cir.1987) and *Founding Church of Scientology of Washington, D.C., Inc. v. Webster,* 802 F.2d 1448 (D.C.Cir.1986), seem split on this issue. *Hull* completely supports the action taken in this case: "Since appellants were never warned by the district judge that their failure to name an expert witness would lead to *de facto*

 

dismissal of their case, it is argued, the sanction was so harsh as to constitute an abuse of discretion. We disagree." 825 F.2d at 451. In *Founding Church of Scientology*, the court, in a footnote, expressed its strong approval of the warning issued by the trial judge prior to ordering dismissal for noncompliance with a discovery order. That approval is not expressed as any sort of absolute requirement, and is better understood as a factor to be considered when determining whether the trial judge abused his discretion. No such prerequisite exists in rule 37 of the federal rules or of the Claims Court, and none should be read into the rule.

There is no dearth of authority in support of dismissal, or sanctions tantamount to dismissal, in cases similar to this where parties do not comply with discovery orders. In *Weisberg v. Webster*, 749 F.2d 864 (D.C.Cir.1984) the sanction of dismissal was affirmed where the plaintiff refused to answer interrogatories propounded by the other side. Similarly, in *G–K Properties v. Redevelopment Agency*, 577 F.2d 645 (9th Cir.1978), dismissal was upheld where the plaintiff delayed production of certain documents the trial judge had ordered produced. The trial court, "to protect the integrity of its orders," granted defendant's motion for sanctions, and dismissed plaintiff's case despite plaintiff's subsequent production of the documents. *Id.* at 647. The Ninth Circuit sustained the dismissal.

In neither *Weisberg, Hull,* nor *G–K Properties* did the trial court issue warnings that dismissal would follow noncompliance. No other Circuit has required such a warning, and several have explicitly rejected the idea. *See Hull,* supra; *Batson v. Neal Spelce Associates, Inc.*, 765 F.2d 511, 515 (5th Cir.1985) (upholding dismissal "although the court's order did not recite that sanctions would follow a refusal to comply"). Such a warning is simply not required by the rule, and there is no reason for injecting such a requirement. Nor has this court ever required a warning before sanctions may be imposed by the trial court. Because the trial judge made the necessary findings to support his conclusions, and because sanctions tantamount to

dismissal are within the trial judge's discretion, I would affirm the decision.