INGALLS SHIPBUILDING,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 183–77C.

United States Claims Court.

Dec. 2, 1987.

As Modified Dec. 15, 1987.

David V. Anthony, Washington, D.C., for plaintiff. Gregory A. Smith and Paul C. Fuener, Pettit & Martin, of counsel.

Helene M. Goldberg and William S. Liebman, Washington, D.C., with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen and Michael F. Hertz, Directors, and Robert L. Ashbaugh, Deputy Director, for defendant. Audrey J. Van Dyke, U.S. Dept. of Navy, of counsel.

## OPINION

SMITH, Chief Judge.

This contract dispute, presently before the court on three of plaintiff's motions, has a long procedural history spanning almost a generation. It is a complex story involving the major issues and problems confronting national defense procurement. At issue are important rights to procedural due process. Public policy questions going to the very heart of an efficient and fair government procurement system provide the background for this conflict. While it is certainly not the role of any court to ensure that our Nation has an adequate and affordable national defense, that is a critical public policy goal that we, of course, must recognize.

For the reasons set forth in this opinion, the court finds that significant procedural rights have been denied the plaintiff by the government, and that judgment must be entered in the plaintiff's favor. Further, the court finds that while procurement fraud must be rooted out of every sector of our defense procurement system, the earlier lengthy civil and lengthy criminal proceedings in this matter have abundantly demonstrated that the facts underlying the instant transaction do not support any finding of fraud on the plaintiff's part. To put the plaintiff through yet a third group of legal proceedings involving no new facts would violate constitutional norms, and be directly contrary to the government's own interest in preserving a viable and honest defense industry willing to risk contracting with the United States. It would also be a terrible waste of legal and judicial resources. Finally, the right to have one's claim heard in a fair and impartial forum under sanction of the Constitution is one of the most precious rights of our system of government under law. Contrary to plaintiff's argument, however, this court believes this constitutional mandate is fully met by jurisdiction over the government's counterclaim and Special Plea in Fraud being lodged in the Claims Court, an Article I court of the United States.

As noted previously, the plaintiff has submitted three motions to this court for decision. In the first motion, plaintiff challenges the jurisdiction of the court over defendant's counterclaim and Special Plea in Fraud. The court finds that it has jurisdiction to decide such claims. In the second motion, the plaintiff asks the court to grant discovery sanctions pursuant to rule 37 of the Rules of the United States Claims Court (RUSCC). For the reasons given below, the court grants discovery sanctions under RUSCC 37(b)(2)(A). The plaintiff's third motion presents three alternative arguments for summary judgment. Plaintiff first argues that if sanctions are granted pursuant to RUSCC 37(b)(2)(A), then summary judgment is appropriate because there are no longer any issues of material fact to be decided. Secondly, plaintiff argues that the rules of issue preclusion have

fully resolved the fraud issues in this case. Thirdly, plaintiff contends that 28 U.S.C. § 2514 (1982) is punitive in nature and, therefore, double jeopardy attaches. Because the court grants sanctions pursuant to RUSCC 37(b)(2)(A), summary judgment in favor of plaintiff is granted. It is, therefore, unnecessary to decide plaintiff's second and third contentions. This is especially appropriate here where plaintiff's alternative theories raise complex questions of first impression in this factual and procedural context. Thus, both judicial economy and judicial restraint counsel against a decision on these issues at this time.

### Facts

The plaintiff here is seeking enforcement of an Armed Services Board of Contract Appeals (ASBCA) decision rendered in its favor in 1976. *Ingalls Shipbuilding Division, Litton Systems, Inc.,* ASBCA No. 17717, 76–1 BCA (CCH) ¶ 11,851 (1976). The dispute arose out of a contract between the Ingalls Shipbuilding Division of Litton Systems (Litton)[1] and the United States Navy (Navy) for the construction of three nuclear attack submarines. In 1968, Litton originally proposed to build and deliver three submarines pursuant to a request for proposals put out by the Navy. Under Litton's proposal, the first submarine was to be delivered on September 15, 1971, the second submarine was to be delivered six months later, and the third was to be delivered one year after the first. On May 23, 1968, Litton was advised by the Contracting Officer (CO) that it would be awarded a contract for three submarines.

The CO proposed delivery of the first submarine in August of 1972, eleven months later than Litton had proposed. Litton advised the CO that the eleven month delay would have substantial consequences on its ability to maintain submarine construction capabilities. However, Litton conducted studies which indicated that construction capabilities could be maintained if the contract was awarded according to Litton's proposed schedule

with the work being "stretched out" over the CO's proposed additional eleven month period. The Navy was apprised of this plan and approved of it.

On June 25, 1968, a contract for the construction of three submarines, priced at a total of $107,400,000, was executed. The contract itself required delivery in accordance with the original schedule proposed by Litton. However, the delivery dates were thereafter extended eleven and one half months pursuant to a Memorandum of Understanding which was executed along with the contract. In August of 1968, Litton submitted a cost proposal for performance of the contract to the extended schedule. Before the parties agreed upon a price, however, the Navy allegedly failed to timely deliver government furnished steel. According to Litton this late delivery of government furnished steel caused an additional six month delay in contract performance.

Subsequently, Litton withdrew its first cost proposal and substituted a second one to the CO. The second proposal sought a $34,000,000 equitable adjustment and reflected a total delay of seventeen and one-half months. The CO, on July 31, 1972, issued a decision allowing a $3,800,000 equitable adjustment. Litton, thereafter, appealed that decision to the ASBCA which, after a sixty-nine day trial, found that Litton was entitled to a $17,361,586 equitable adjustment. *Ingalls Shipbuilding Division, Litton Systems, Inc.,* ASBCA No. 17717, 76–1 BCA (CCH) ¶ 11,851 (1976). The ASBCA made several findings of fact, including findings that Litton's six month extension of the schedule was due to the late delivery of government furnished steel, that Litton's decision to subcontract platen work was caused by the late government furnished steel, that Litton had adequate manpower and facilities at all relevant times during the performance of the contract, and that alleged inadequacies in manpower and facilities did not cause the

---

1. On November 4, 1987, the court granted plaintiff's Motion for Substitution of Plaintiff. Thus, the case is no longer captioned as *Litton Systems, Inc.,* but rather is captioned as *Ingalls*

*Shipbuilding, Inc.* However, for historical purposes, the court has retained all references to Litton since Litton has been the party in interest for substantially all of this litigation.

six month extension. Pursuant to an agreement between the government and Litton, the amount of the equitable adjustment, $17,361,586, was provisionally paid to Litton pending the ultimate decision of this court.

Not long after the end of the sixty-nine day trial before the ASBCA, the government began a series of grand jury investigations into Litton's behavior relating to the claim. The third grand jury, on April 6, 1977, indicted Litton on one count of submitting a false claim. On that same day, Litton filed the present case in the Court of Claims[2] seeking enforcement of the ASBCA award[3]. The government then filed in its answer a Special Plea in Fraud under 28 U.S.C. § 2514 (1982), a counterclaim under the civil portion of the False Claims Act, 31 U.S.C. §§ 3729–31 (1982), and a counterclaim demanding return of the money already provisionally paid to Litton. The answer also included an affirmative defense of fraud in the resolution process which defendant claims deprives the ASBCA decision of any finality.

Shortly after the answer was filed, the case was suspended pending a decision in the criminal litigation. In December of 1984, after two dismissals, two appeals[4], and a two month trial, Litton was found not guilty of criminal fraud. The case here was reactivated in 1985 by former Chief Judge Alex Kozinski. After reactivation, the defendant filed its amended answer which dropped the False Claims Act counterclaim. The plaintiff's current motions will be discussed seriatim below.

### Litton's Motion to Dismiss the Counterclaim and Special Plea in Fraud

#### Constitutionality of the United States Claims Court

The first issue before the court is plaintiff's motion to dismiss defendant's False Claims Act counterclaim and Special Plea in Fraud.[5] Litton argues that the Claims Court, because of its creation by Congress under Article I of the Constitution, has no jurisdiction over the Special Plea in Fraud or the counterclaim as they are both based upon common law fraud. The argument is grounded upon the assertion that common law fraud actions, whether affirmative actions or counterclaims, require an exercise of that judicial power vested exclusively in courts created under Article III of the Constitution. Litton avers that since the Claims Court is an arm of Congress[6] it

---

**2.** This case was transferred to the Claims Court docket pursuant to the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25.

**3.** The government is contractually bound under the disputes clause included in this contract to abide by the decision of the ASBCA. The plaintiff's remedy for breach of a contract for non-payment after an ASBCA decision is a suit in the Claims Court for damages in the amount of the ASBCA award. *Fischbach & Moore Int. Corp. v. United States,* 223 Ct.Cl. 119, 617 F.2d 223 (1980). This is so because this case was filed prior to the November 1, 1978, effective date of the Contract Disputes Act of 1978. If this case were to arise today the government would have an appeal of the ASBCA decision to the Court of Appeals for the Federal Circuit. 41 U.S.C. § 607(g)(1)(B) (1982).

**4.** The case was first dismissed for prosecutorial misconduct by the District Court for the Eastern District of Virginia. That decision was reversed by the Fourth Circuit Court of Appeals. *United States v. Litton Systems, Inc.,* 573 F.2d 195 (4th Cir.1978). Upon remand and transfer, the District Court for the Southern District of Mississippi dismissed the case for failure to prosecute because of a five year delay following indictment. That decision was reversed by the Fifth

Circuit Court of Appeals. *United States v. Litton Systems, Inc.,* 722 F.2d 264 (5th Cir.1984).

**5.** The defendant has dropped its counterclaim under the False Claims Act, 31 U.S.C. § 3729 (1982). However, because the court's analysis is applicable to both that counterclaim and the Special Plea in Fraud, the court will continue to refer to both of defendant's claims as they were referred to in the parties' respective briefs. The defendant's general counterclaim is not the subject of this jurisdictional motion.

**6.** This terminology "arm of Congress" is often used to refer to courts or administrative agencies created under the powers given to Congress under Article I of the Constitution. This terminology, however, is analytically confusing. This court or an administrative agency, for example, the Federal Trade Commission, are not direct agents of the Congress as is the Clerk of the House of Representatives or the Secretary of the Senate. Claims Court judges are appointed for fixed terms by the President with Senate confirmation. Like courts created under Article III or administrative agencies created under Article I, the Claims Court is only directed to action by the Congress through the law-making process.

may exercise only those powers which the Congress itself may exercise. Litton also argues that the separation of powers doctrine precludes Congress from exercising Article III judicial powers and, therefore, this deprives the Claims Court of jurisdiction. To the contrary, the defendant argues that Congress may condition its waiver of sovereign immunity upon any terms it desires, including the requirement of suing in an Article I court with the government's right to counterclaim and to seek set-off in that court as well. The waiver of sovereign immunity, upon which defendant's argument rests, is not a mere formality but a most important change in the law enacted by the creation of this court's jurisdiction in 1855.[7] It is one outgrowth of centuries of concern with the problem of government accountability and the balance between government discretion and legal authority.

### a. Purpose of Sovereign Immunity

While the notion of sovereign immunity grew out of the British Crown's personal authority and relationship to the State, the doctrine has deep roots in our own system in the very definition of government. Government is not just a player in the legal and social marketplace, but it is the sovereign; the institution entrusted to act as the representative of the whole Nation and in the Nation's interest. The sovereign is the ultimate source of positive law and political legitimacy. It is the umpire and scorekeeper as well as a significant player in this market-place. Therefore, in many areas, to make the sovereign justify its actions before courts of any type would contradict the republican premise upon which our Constitution was established. The Congress and the President are the Constitution's devices for ensuring that the ship of state is properly steered. The courts protect the rights of individuals from that ship's wake or bow.

Democratic choice is not subject to judicial review under our form of government. No court can or should decide who is to be elected President, whether the Nation shall have peace or war, or what the tax rate shall be. The Constitution does, however, lay out certain areas of human life which are beyond the power of the federal sovereign. These are defined by the rights, privileges, and immunities of our citizens provided for in the Constitution. The Article III courts act as the defenders of the Constitution against the sovereign in these areas. This has been their historic and preeminent role. However, the other departments and officers of government have always been thought bound to exercise this duty as well. For instance, members of the executive department upon their entry into office take an oath to "support and defend the Constitution of the United States." If this oath is to mean anything, it must require officers of the United States to be knowledgeable in the requirements of the Constitution and to conduct their duties consistently with the Constitution. Further, the Claims Court judges take the same oath to exercise their duties consistently with the Constitution, which Chief Justice Marshall referred to in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180, 2 L.Ed. 60 (1803).

The sovereign has created several Article I forums, such as the Claims Court, to protect certain fundamental rights of the citizens in areas not traditionally encompassed by Article III jurisdiction. While these rights are the same fundamental rights protected by the Article III courts,

---

With the exception of the congressional reference jurisdiction, the Claims Court's administrative structure is identical to all other courts and federal agencies, and different from officers of the Congress or entities like the General Accounting Office or the Library of Congress which take direction from the Congress in management as well as through laws passed. Even this court's congressional reference jurisdiction is exercised under statute, 28 U.S.C. §§ 1492, 2509 (1982), and through committee vote. Thus, it is most analytically correct to describe the Claims Court, as well as the so-called independent regulatory agencies, as exercises of congressional law-making power under Article I that are not formally subject to the structure established by Articles II or III. If one wanted to place the court on an ultimate organizational chart created under strict constitutional guidelines, it would be found, along with other entities, to hover on the somewhat fuzzy borders separating Articles I, II and III.

7. Act of February 24, 1855, ch. 122, 10 Stat. 612.

in that they relate to the protection of the individual's most vital concerns: life, liberty and property; they are questioned or threatened in a context different from the strict relationship between citizen and sovereign. Rather, disputes over them arise in contexts where citizens traditionally had no recourse to the judiciary but relied upon the grace of their government or political protections. They dealt with such relationships as sovereign-soldier, sovereign-contractor, sovereign-tenant, sovereign-employee, sovereign-territorial resident, or sovereign-taxpayer. While the most fundamental interests of human beings were implicated by disputes in these relationships, there was never the same constitutional and political concern that characterized the guardianship by Article III courts of the sovereign-citizen relationship, since that, of course, is the most fundamental relationship any Constitution must deal with. The Tax Court, the Court of Military Appeals, the District of Columbia courts, the territorial courts, and the Claims Court are all examples of bodies created to protect and preserve deeply felt constitutional norms as well as fundamental rights not strictly within the judicial power. So long as there has been an ultimate appeal to an Article III forum on constitutional questions, there has not been a perceived constitutional violation in this approach since the earliest days of the republic. This has been particularly true with regard to matters involving public rights, *Northern Pipeline Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 60 n. 23, 102 S.Ct. 2858, 2870 n. 23, 73 L.Ed.2d

598 (1982), and matters which fall into the area where "certain exceptional powers [have been] bestowed upon Congress by the Constitution or historical consensus." *Id.* at 70, 102 S.Ct. at 2871.

### b. The United States Court of Claims

One of the first milestones directed towards the achievement of the accountability of the sovereign in areas not governed by traditional rights against the government was the creation in 1855, and final legal authority by Act of Congress in 1866, of the United States Court of Claims.[8] Its jurisdiction allowed redress for abuses by the sovereign which were not generally subject to district or Supreme Court remedy because of the lack of a right to sue the sovereign. Thus, since there was no constitutional right to a government contract, or a government job, or other basis which would require payment from the public treasury, the traditional Article III jurisdiction could not prevent the sovereign from flaunting the contractual or statutory rights of contractors or employees.

This is not to say that citizens injured by government action had absolutely no redress. Injured citizens of the United States, like British subjects who petitioned the King, could petition the sovereign for a private bill for redress. While this political redress was consistent with a free society, it created a number of problems. As the number of claims upon Congress for these private bills increased, the number of claims decided declined, effectively denying many claims. See *Shimomura, The Histo-*

---

**8.** In *Gordon v. United States,* 69 U.S. (2 Wall.) 561, 17 L.Ed. 921 (1864), the Supreme Court, in a summary by the Court Reporter, refused to review a Court of Claims decision because the Act of March 3, 1863, required Congress to appropriate money before a judgment was paid. Thus, in the Supreme Court's view, the Court of Claims decision was not final. Congress reacted to the Gordon decision and corrected the defect by Act of March 17, 1866. In every case thereafter, the Supreme Court has exercised appellate jurisdiction, where it was otherwise proper, over Court of Claims cases, thus, recognizing the validity of the Court of Claims.

The *Gordon* case itself is an interesting legal oddity. It seems that it was the last opinion written by Chief Justice Taney who had delivered it over the summer to the Court Clerk to be distributed to the other justices. During the summer, however, Chief Justice Taney died and the opinion was either not filed, or was misplaced. Thereafter, in 1864, the Court Reporter entered a short statement of the case in the official Supreme Court Reports. Chief Justice Chase then wrote an opinion which was published in the Court of Claims Reporter, see generally 7 Ct.Cl. 1 (1871), but not in the official Supreme Court Reports. In 1886, the original opinion by Chief Justice Taney was discovered and finally published in the Supreme Court Reporter, 117 U.S. 697 (1886). For a more detailed version of this story see *W.M. Wiecek, The Origin of the United States Court of Claims,* 20 Ad.L.Rev. 387, 389 (1968) and *W. Cowen, P. Nichols Jr., M. Bennett, 2 United States Court of Claims, a History,* 24 (1978).

*ry of Claims Against the United States: The Evolution from a Legislative Toward a Judicial Model of Payment,* 45 La.L. Rev. 625, 648–650 (1985). Further, since the process was not "legal," it was not subject to any rules, procedures or standards. The potential for favoritism and corruption in this standardless "system" was all too real. The Court of Claims, now restructured as the Claims Court,[9] was originally created to help the Congress deal more fairly and more judicially with this problem of sovereignty. The Claims Court, and other courts created under Article I as well as some "Article I jurisdiction"[10] conferred upon the district courts, now satisfies the societal belief that government must act decently even when there is no constitutional right to sue or to bring the government before the Article III judicial power.[11] This is the basis for plaintiff's ability to argue its case today as a matter of right rather than as a plea or as a petition seeking a favorable act of grace from the Congress in the form of a private bill.

### c. Waiver of Sovereign Immunity

The creation of the United States Court of Claims involved a significant waiver of sovereign immunity. It converted a system of political discretion into one of legal right. The act was not one of pure grace, however. To the same extent that a contractor, federal government employee, soldier, patent holder, or taxpayer depends upon the waiver of sovereign immunity for the right to seek redress, the government relies upon the established system to act fairly in relation to its legitimate interests, and to adjudicate issues efficiently. In this all too human world the government as sovereign has legitimate interests that other litigants do not. *See Cherry Cotton Mills v. United States,* 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946). It is responsible for the execution of all the laws, the trusteeship of all the taxpayers' money, and has the duty to act reasonably and effectively as the guardian of national security. These are interests at the heart of any free government and clearly expressed in various constitutional clauses. They are a valid basis for conditioning the right to sue the government in a special nationally based jurisdiction with no jury trial right and judges appointed for fixed-terms and not for life. The interest of the Congress in resolving some matters that are not cases or controversies, but like them, and closely related to the waiver of sovereign immunity, in a judicial forum is another legitimate reason for establishing an Article I court as a required forum in return for the waiver of sovereign immunity. That is why the waiver of sovereign immunity, as shown below, may be, and is, conditioned upon the right of the government to have all aspects of a contractor's claim determined in a single proceeding. It also reflects the legitimate government interest in a relatively uniform body of government contract law expressed in the national jurisdictions of the boards of contract appeals and this court with unified appellate review in a single national circuit court. This scheme clearly has a rational basis and is well calculated to achieve that purpose.

**9.** On October 1, 1982, the Claims Court came into existence with the original jurisdiction of the Court of Claims. The appellate judges of the Court of Claims became, along with the Court of Customs and Patent Appeals, the Court of Appeals for the Federal Circuit Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25.

**10.** For instance, the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (1982), confers upon the district courts jurisdiction to hear certain claims, up to $10,000, which traditionally have been heard by an Article I tribunal. Also, the district courts under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1982), can hear certain enumerated tort claims against the United States. The district courts also hear tax refund cases concurrently with the Claims Court, 28 U.S.C. § 1346(a)(1) (1982).

**11.** President Lincoln said, in his State of the Union message on December 3, 1861, "It is as much the duty of Government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals." Cong. Globe, 37th Cong., 2d Sess., app. 2 (1861). This wisdom is engraved on the wall of the National Courts Building in Washington, D.C., the home of the United States Claims Court.

#### d. Historic Precedent

The jurisdictional demarcation between Article I and Article III courts did not begin recently. In 1828, Chief Justice Marshall's opinion in *American Insurance v. Canter*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828), dealt with whether the territorial courts could exercise Article III judicial power over a case sounding in admiralty. The contention was that the territorial courts could not decide cases sounding in admiralty because the judges of the territorial courts were appointed for limited terms and were not judges of a court established under Article III, section 1 of the Constitution which provides that:

> the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress ... may ... establish. The judges ... shall hold their offices during good behaviour, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

Chief Justice Marshall noted the four year term of the territorial judges and concluded that the territorial courts were not "constitutional" courts under Article III but rather were "legislative courts" established under Article I. Nevertheless, the Supreme Court upheld the territorial court's determination of the case on the grounds that other portions of the Constitution gave Congress the power to make "all needful rules and regulations respecting the territory belonging to the United States." *American Insurance v. Canter*, 26 U.S. at 546.

Since *American Insurance v. Canter*, the Supreme Court has devoted substantial time and consideration to the distinction between Justice Marshall's "constitutional" and "legislative" courts. See *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838) (upholding the District of Columbia's "legislative" courts); *O'Donaghue v. United States*, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) (overruling *Kendall* and labeling the Supreme Court and the Court of Appeals of the District of Columbia "constitutional" courts); *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933) (concluding that the Court of Claims was a "legislative" court established under Article I); *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (overruling *Williams* and *Ex parte Bakelite*, 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), and concluding that the Court of Claims was an Article III "constitutional" court).

The case presently before this court again raises this question. In *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933), the Supreme Court held that the Court of Claims was established under Article I of the Constitution, based on the grant to Congress of the power to pay the debts of the United States. Although *Glidden* overruled *Williams* to the extent of its final conclusions,[12] Congress, with enactment of the Federal Courts Improvement Act of 1982, has created, with respect to the Claims Court, a new circumstance. Congress has declared the Claims Court to be an Article I court upon the *Williams* rationale of the constitutional grant to Congress of the power to pay the debts of the United States. This then brings into issue the question of whether the Claims Court can exercise jurisdiction over government counterclaims, set-offs, and other claims based upon alleged fraud, such as the Special

---

**12.** *Glidden* spoke on the issue of sovereign immunity and found, contrary to the assumption in *Williams,* that the Framers were familiar with the history of waivers of sovereign immunity. They were familiar with that history both in England, and in America under the Articles of Confederation. It found that an Article III court could hear suits against the United States. It did not deal with whether an Article I court could hear such claims. Furthermore, there is no indication that the Court intended to overrule anything more than the respective results of *Williams* and *Bakelite.* The Supreme Court expressly refused to examine the *Bakelite* Court's determination that "[l]egislative courts also may be created as special tribunals to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it." *Glidden,* 370 U.S. at 548, 549, 82 S.Ct. at 1472 (quoting *Bakelite,* 279 U.S. at 451, 49 S.Ct. at 413). Thus, the *Glidden* opinion does not speak to the question at issue here.

Plea in Fraud here. The court is of the opinion that it may exercise such jurisdiction. The defendant's assertion that the United States can condition its waiver of sovereign immunity upon any terms it deems proper, including counterclaims and set-offs based upon fraud, finds ample support in the cases. Further, plaintiff points to no specific provision in the Constitution that would prohibit such a condition.

### e. Constitutionality of the Conditioned Waiver

The conditional waiver of sovereign immunity was first espoused in *Murray's Lessee v. Hoboken Land Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855). There the Supreme Court said "[i]t is equally clear that the United States may consent to be sued, and may yield this consent upon such terms and under such restrictions as it may think just." *Id.* at 283. In *Ex parte Bakelite*, 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), the Supreme Court said, when discussing the status of the Court of Claims, "[n]or do claimants have any right to sue [the United States] unless Congress consents; and Congress may attach to its consent such conditions as it deems proper, even to requiring that the suits be brought in a legislative court specially created to consider them." *Id.* at 452, 49 S.Ct. at 413–414.

Again in *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933), the Supreme Court had the opportunity to discuss the implications of a waiver of sovereign immunity. In that case, the Court held that the Court of Claims was a legislative court which drew its power from the constitutional grant to Congress of the power to pay the debts of the United States. In so holding the Court said:

And since Congress, whenever it thinks proper, undoubtedly may, without infringing the Constitution, confer upon an executive officer or administrative board, or an existing or specially constituted court or retain for itself, the power to hear and determine controversies respecting claims against the United States, it follows indubitably that such power, in whatever guise or by whatever agency exercised, is no part of the judicial power vested in the constitutional courts by the third article. That is to say, a power which may be devolved, at the will of Congress, upon any of the three departments plainly is not within the doctrine of the separation and independent exercise of governmental powers contemplated by the tripartite distribution of such powers. We find nothing which militates against the foregoing views in the requirement that the Court of Claims, in cases properly brought before it in respect of property expropriated in the exercise of the power of eminent domain, must award just compensation under the Fifth Amendment, or in the provision of the Tucker Act (U.S. Code, Title 28, § 252) requiring the court in cases brought against the government also to consider and decide set-offs and other claims made by the government against the petitioner and award judgment accordingly. In the former case the requirement is one imposed by the Constitution and equally applicable whether jurisdiction be exercised by a legislative court or a constitutional court; and the latter is simply a provision which the claimant must accept as a condition upon which he may avail himself of the privilege of suing the government in the special court organized for that purpose. (citations omitted).

*Williams*, 289 U.S. at 580–81, 53 S.Ct. at 760.

These cases suggest that government counterclaims and set-offs are not matters exclusively confided to the judicial power created by Article III. In fact, the Special Plea in Fraud under 28 U.S.C. § 2514 (1982), was codified, at the time of *Williams*, in substantially the same form as 28 U.S.C. §§ 279–80 (1926).[13]

█ As the plaintiff would have it, the government could not defend itself against fraudulent claims prosecuted in the Claims Court pursuant to the privilege to sue

---

**13.** This statute was originally enacted as part of the Act of March 3, 1863, ch. 92, § 11, 12 Stat. 767. It was repealed and replaced by Act of March 3, 1911, ch. 231 § 297, 36 Stat. 1168.

which has been granted to the plaintiff. A reading of the Constitution that would require a judgment to be rendered for a plaintiff on a fraudulent claim but would only allow that judgment to be voided after a second trial on the fraud issues in an Article III court, is a reading that is not only inconsistent with the case law, but also with logic, historical practice, and the efficient administration of justice. Such a reading is not warranted by either the facts of this case or good law. Because the Constitution did not provide for, nor prohibit, the waiver of sovereign immunity, it is up to the Congress to decide whether or not to grant a waiver. If the Congress grants the waiver, as it has, then, as shown above, plaintiffs exercise the privilege only on the terms which Congress has deemed appropriate. The only exception would be if these conditions violated some specific provision of the Constitution or the separation of powers doctrine. *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed. 2d 583 (1986). As noted earlier, they do not.

### f. Actions at Common Law

█ In addition to the above, the court is of the opinion that the Special Plea in Fraud and the counterclaim were not actions at common law and, therefore, do not require exercise of that power reserved exclusively to an Article III court. The leading case on this point is *McElrath v. United States*, 102 U.S. (12 Otto) 426, 26 L.Ed. 189 (1880). In *McElrath* a Marine lieutenant sued the United States in the Court of Claims for back pay which allegedly was owed him. The United States counterclaimed by charging that the back payments which had previously been made were erroneous. The United States prevailed on the counterclaim and the plaintiff appealed to the Supreme Court. There the plaintiff argued that the counterclaim was in violation of the Seventh Amendment of the Constitution which provides that "[i]n suits at common law, ... the right of trial by Jury shall be preserved." Although the Court of Claims trial had been conducted without a Jury, the Supreme Court found that:

there is nothing in these provisions [Statutory provisions directing the Court of Claims to consider set-offs and counterclaims and to decide issues of fact without a Jury] which violates either the letter or spirit of the 7th amendment. Suits against the government in the Court of Claims, whether reference be had to the claimants demand, or to the defense, or to any set-off, or counter-claim which the government may assert, are not controlled by the 7th Amendment. *They are not suits at common law within its true meaning. The government cannot be sued, except with its own consent.* It can declare in what court it may be sued, and prescribe the forms of pleading and the rules of practice to be observed in such suits.... Congress ... informs the claimant that if he avails himself of the privilege of suing the government in the special court organized for that purpose, he may be met with a set-off, counter-claim, or other demand of the government.... If the claimant avails himself of the privilege thus granted, he must do so subject to the conditions annexed by the government to the exercise of the privilege. Nothing more need be said on this subject.

*McElrath,* 102 U.S. at 440 (emphasis added).

█ The main thrust of the *McElrath* decision concerns whether a counterclaim made by the government is a suit at common law. The Supreme Court has said that a "touchstone" of justiciability is "whether the action sought to be maintained is of a sort recognized at the time of the constitution to be traditionally within the power of the courts in the English and American judicial systems." *Glidden Co. v. Zdanok,* 370 U.S. 530, 563, 82 S.Ct. 1459, 1479, 8 L.Ed.2d 671 (1962) (citing *United Steel Workers of America v. United States,* 361 U.S. 39, 44, 80 S.Ct. 1, 4, 4 L.Ed.2d 12 (1959) (Frankfurter, J., Concurring)). The constitutional test is thus whether these types of matters were among the traditional concerns of the courts at common law, equity, or admiralty. If not, then they fall outside those matters

reserved by Article III for the exclusive jurisdiction of the judiciary created by that Article.

■ The Claims Court can decide the government's counterclaim and Special Plea in Fraud because, as recognized in *McElrath*, government counterclaims in this context are not actions at common law within that term's historical meaning. At common law such actions were unknown as there was no need for the sovereign to counterclaim or to seek set-off since there was no right to sue the sovereign. Neither the counterclaim, nor the Special Plea in Fraud, can be viewed as independent civil actions for fraud by the sovereign against the plaintiff. This is no more realistic nor more logical than abstracting any other part of this proceeding and then suggesting that it could stand alone and, therefore, would not be a government contract case. It would be as unrealistic as judging the relevance of a defendant's evidence without allowing consideration of plaintiff's complaint. Or perhaps like allowing the plaintiff to put on direct testimony but barring the defendant's cross on the grounds that it could be raised in a separate suit. But perhaps the best way of looking at the contention is beyond the legal context. If only the fielder is prohibited from catching the batter's hit, a simple out would become a home run! But that wouldn't be baseball.

Based on the above discussion, the Claims Court has the jurisdiction to hear and determine the government's Special Plea in Fraud. Therefore, plaintiff's motion to dismiss must be denied.

**Litton's Motion for Sanctions**

The second of Litton's motions presently before the court is the motion for discovery sanctions pursuant to RUSCC 37.[14] This motion focuses the court's attention on the character of defendant's behavior in this case. Since at least 1973, there has been virtually no change in the defendant's position that a fraud was perpetrated on the

government by Litton. To this end, the defendant has impaneled several grand juries, including one special eighteen-month grand jury, and has held five investigations into Litton's request for an equitable adjustment. The government has had, not only its day in court, but sixty-nine days before the ASBCA during which the government was requested to, but never did, point out any attempted use of fraudulent evidence by Litton. And to cap this set of proceedings, a two-month criminal trial on the sole issue of fraud in submitting the equitable adjustment to the Contracting Officer was held in 1984, in which Litton was found not guilty. To make matters here even more like *Jarndyce v. Jarndyce*, (Dickens, Bleak House (1853)), the time in the criminal process was years long, involving two district court dismissals and two government appeals prior to the final verdict in Litton's favor. While justice delayed is most certainly justice denied, more than fifteen years in the legal system may be even worse.

### a. Fraud Standard

As serious a charge as fraud is, it is not an amorphous concept. It is well recognized to be committed by particular individuals who have either lied, misstated the facts, drafted misleading documents, or have in some other manner manifested an intent to defraud. Wright & Miller, Federal Practice & Procedure: Civil, § 1289 at 403 (1969); *Kamen Soap Prod. Co. v. United States*, 129 Ct.Cl. 619, 124 F.Supp. 608 (1954) (plaintiff submitted false letter); *Lapus v. United States*, 145 Ct.Cl. 660 (1959) (gross inflation of amount and value of property taken). Because allegations of fraud, even civil fraud, profoundly reflect upon the character of parties against whom the allegations are made, courts have long recognized that parties need additional protection from unwarranted and unfounded allegations. The Supreme Court recognized this early on when it said:

---

14. RUSCC 1(b) provides that "[t]he Federal Rules of Civil Procedure applicable to civil actions tried by the court sitting without a jury and in effect on August 1, 1985, have been

incorporated into these rules to the extent that they can be applied to proceedings in this court." *See also Miller, The New United States Claims Court*, 32 Clev.St.L.Rev. 7, 14–20 (1983).

A complainant ... must state in his bill distinctly the particular act of fraud, misrepresentation or concealment—must specify how, when, and in what manner, it was perpetrated. The charges must be definite and reasonably certain, capable of proof, and clearly proved.... And especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made.

*Stearns v. Page*, 48 U.S. (7 How.) 819, 12 L.Ed. 928 (1849).

This requirement, as restated in RUSCC 9(b), of specifically identifying fraud is a wise one, especially in light of the great potential for abuse present in mere allegations of fraud. Additionally, the rule serves the particular purpose of apprising an allegedly fraudulent party of the claim against him and of the facts that will be relied upon, so that the party can prepare an adequate defense. Wright & Miller, § 1297 at 404.

The particularity requirement applies not only to complaints but also to counterclaims and allegations of fraud which serve as affirmative defenses. Wright & Miller, § 1297 at 406. Wright & Miller note that "considerable particularity may be necessary to state a claim under ... the false claim statutes or a claim attacking a judgment on the ground of fraud." *Id.* § 1298 at 412.

In *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373 (D.C.Cir.1981), plaintiff brought a claim under the False Claims Act alleging that at unspecified times unnamed members of Senator Cannon's staff rendered personal services for the Senator while collecting their federal salaries. The Court of Appeals, in upholding the district court's dismissal of the claim, said "the rule serves to discourage the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude." *Id.* at 1385. The court went on to state that "[i]n the present case plaintiff's allegations could hardly have been more generalized and vague. He did not specify which members of the Senator's staff were involved, and he left unstated just what personal services they performed and precisely when those activities occurred." *Id.* at 1386. The court then denied the appellant permission to file a more definite statement, a bill of particulars, or to obtain the facts by discovery, because plaintiff had eleven months in which to remedy the deficiencies and never did. *Id.* at 1386.

### b. Purpose of Discovery when Fraud is Alleged

While the court realizes that the current case is not a case arising under RUSCC 9(b), it also realizes that there are few practical differences between cases such as *Cannon* and the current case. There is little real difference between a complaint in fraud which gives no information, and answers to interrogatories, such as those here, which are so broad as to give no information. In neither case is the opposing party given sufficient notice of the claim, nor are the due process safeguards built into RUSCC 9(b) and the discovery process complied with.

When more particular facts are needed in a fraud case, the usual tactic is to move for a more definite statement. Wright & Miller, § 1300 at 419. However, it is well recognized that discovery procedures can serve the same function as a motion for a more definite statement. *United States v. Sonstein*, 27 F.R.D. 284 (E.D.Penn.1961). The plaintiff was well aware of the previously discussed purposes behind RUSCC 9(b) when it promulgated its interrogatories. The interrogatories in question here were designed to find out exactly what the fraud was. "It is beyond question that a party is entitled to discovery of the facts upon which [the] claim of fraud is founded." *Cornaglia v. Ricciardi*, 63 F.R.D. 416, 419 (E.D.Penn.1974). Furthermore, it is true that "interrogatories may be used ... to inquire into matters already within the interrogating party's own knowledge.... In general, the scope and use of interrogatories has been given a broad and

liberal construction in the interest of obtaining a fair trial and eliminating surprise." *Stonybrook Tenants Assoc. v. Alpert*, 29 F.R.D. 165 (D.Conn.1961). A statement found in *Flour Mills of America, Inc., v. D.F. Pace*, 75 F.R.D. 676 (E.D. Okla. 1977), is particularly on point: "a broad statement that the information sought is available from a mass of documents and that the documents are available for inspection simply is not a sufficient response to satisfy the aims of discovery." *Id.* at 682.

■ It is clear then that when allegations of fraud are in the air the alleging party has a duty to inform the opposing party of the exact actions which are allegedly fraudulent. This requirement is not satisfied by broad assertions that all is fraudulent; rather, specific facts must be avered so that the allegedly fraudulent party can present facts to deal with these charges. This is one of the most fundamental requirements of any system guaranteeing a fair trial. Trial without notice of the charge has become the twentieth century's caricature of totalitarian "legal" systems. Thus, the court is bound to examine the interrogatories in question to determine whether the mandates of due process with regard to allegations of fraud have been met. The court is of the opinion that Litton, by the defendant's actions, has been denied its right to a full and fair opportunity to present its defense. Because of this, as seen below, the court grants Litton's motion for sanctions pursuant to RUSCC 37(b)(2)(A).

#### c. The Rule

RUSCC 37 provides in pertinent part that:

(a)(2) *Motion.* If ... a party fails to answer an interrogatory submitted under Rule 33, ... the discovering party may move for an order compelling an answer....

....

(3) *Evasive or Incomplete Answer.* For purposes of this subdivision an evasive or incomplete answer is to be treated as a failure to answer.

....

(b)(2) *Sanctions Against a Party.* If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule ... the court may make such orders in regard to the failure as are just and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order[.]

Because of the spirit and competence of the Bar of the United States Claims Court, the court has had, thankfully, little need to apply this rule. However, when it has applied the rule, the court has not hesitated under appropriate facts such as those presented here to impose sanctions which ultimately lead to dismissal. *See Wright v. United States*, 2 Cl.Ct. 409 (1983); *Anchor Estates, Inc. v. United States*, 11 Cl.Ct. 578 (1987) *aff'd by unpublished opinion* 835 F.2d 871 No. 87–1290 (Fed.Cir. Nov. 19, 1987). The court would note here that it is convinced that the failure to comply with this court's order in this case is not an action of personal contumacious behavior by defendant's counsel, rather, this case and the previous legal proceedings reflect the basic lack of any foundation for defendant's claim other than institutional momentum.

#### d. Court's Orders

Before a court can order sanctions under RUSCC 37 for inadequacy of discovery, there must be an outstanding order compelling compliance with the discovery process. *Petroleum, Ins. v. Hartford,* 106 F.R.D. 59 (D.Mass.1985); Wright & Miller, Federal Practice & Procedure, Civil § 2282 at 757 (1970). The defendant contends that this is not the case. Contrary to defendant's contentions, however, such an order was issued. On October 17, 1977, the defendant served its first set of objections and responses to Litton's interrogatories of August 3, 1977. Because Litton perceived the defendant's responses to be inadequate, it filed a motion for sanctions or alternatively, an order to compel the defendant to

adequately respond to the August 3, 1977, interrogatories. On December 20, 1977, Trial Commissioner Louis Spector granted plaintiff's alternative motion to compel the defendant to answer the interrogatories. Shortly after this motion was granted, the proceedings were suspended and remained so until the case was re-activated in 1985. On August 1, 1985, a status conference was held and on August 9, 1985, Chief Judge Alex Kozinski issued an "Order" stating that the defendant shall answer plaintiff's interrogatories numbered 16, 17, 18, 19, 21, 25, 28, 29 and 30.

■ The defendant maintains that the order of August 9, 1985, was not an order compelling discovery but was merely a scheduling order. This view is without any merit. The August 9, 1985, document is labeled "Order" and states that defendant "shall" answer the particular interrogatories. Were this merely a scheduling order it would not have singled out certain interrogatories; indeed, it probably would not have required the defendant to answer interrogatories at all since an order to answer them had been issued in 1977.

The defendant also insists that Commissioner Spector's order of December 20, 1977, cannot be used as a prerequisite to a motion for sanctions as it is eight years old and does not specify exactly what is required of defendant. However, to determine what was expected, all the defendant had to do was read the original motion for sanctions filed on October 25, 1977. Further, in light of the record of the August 1, 1985, status conference, the defendant cannot legitimately argue that it did not believe that the December 20, 1977, Order was still good. The record from that status conference reads as follows:

> MR. ANTHONY: We would ask the court today to reinstate the order of Judge Spector and require the government, within thirty days, to comply with that order....
>
> JUDGE KOZINSKI: Actually the suspension is lifted that the order would go into effect by its own force.

The court determines that there is an outstanding order compelling discovery upon which to base a motion for sanctions. The court now turns to the question of whether to grant the motion for sanctions. To resolve this issue the court will examine in detail the question of whether the defendant properly responded to the interrogatories in light of the aforementioned due process concerns. The plaintiff contends that interrogatories numbered 17B, 21, 25, 28, 29 and 30 are the worst offenders.

### e. The Interrogatories

Because the court finds that all of the interrogatories in question are to some extent unanswered, the court will examine only those which are the most egregious. The court feels that numbers 17B, 28, 29 and 30 are the worst offenders. Interrogatory number 17B asks the defendant to provide "any and all evidence relied upon by defendant in contending that a particular portion of a document allegedly constitutes the corrupt practice or attempt to practice fraud against the United States." This interrogatory is designed to identify the evidence that defendant will rely upon in presenting its Special Plea in Fraud. The response to number 17B refers Litton to the response to interrogatory number 16, and the response to number 7B which was a list of 136 documents and forty-seven witnesses. In addition, the 1985 response refers Litton to attachment A, a list of twenty-one documents which the defendant maintains are fraudulent. The 1985 response also provides a list of twenty-seven witnesses that testified at the ASBCA trial and the criminal trial and refers Litton to the documents used in the criminal trial. On its face this plethora of evidence satisfies the request but upon inspection it really does not. The underlined words "Identify any and all evidence" are defined to include for documentary evidence: the specifics of the creation, description, and existence of the document; and for witnesses: the date of testimony and specifics regarding statements the witnesses may have made. For testimony, Litton wants the name, position and address of each witness, and a statement identifying the nature of the testimony by providing a summary of the facts to be proven thereby.

The defendant's centerpiece, attachment A, referred to in the 1985 answer to number 17B, to the extent that it refers to some of the documents in question, is a partially adequate response. However, attachment A refers to only twenty-one documents, far short of describing all 136 documents which defendant indicates it may use. Attachment A also does not address witness testimony which would seem to be a large part of defendant's case. Such a broad list of documents and witnesses is not in keeping with the spirit of discovery since Litton is trying to whittle down the allegations of fraud to the actual testimony or documents which were allegedly false.

The 1977 response to interrogatory number 16 referred to by number 17B, is a perfect example of the defendant's failure to provide specific information. It states: [15]

> The government currently contends that all parts of all three documents are inextricably interwoven to form a web of deceit. Segments which may be innocent standing alone, become a part of the corrupt practice when coupled with more overtly fraudulent portions.

The response to number 16 is representative of the defendant's position that the " 'whole' transaction was tainted by fraud" and, therefore, the defendant does not have to specifically answer the interrogatories. This attitude is, of course, contrary to the laudable ends sought to be fulfilled by the discovery process. If defendant is to argue fraud, it should, in all good conscience, inform plaintiff what the fraud might be. At the February 20, 1986, oral argument on this issue, the court raised this same point with government counsel. The court was never able to obtain a clear statement of the government's theory of what it was that Litton or its employees did that actually constituted the fraud. The transcript reads:

> THE COURT: Well, now, does the Government contend that it didn't know what the plaintiff wanted was specific names and portions of testimony?
>
> MS. GOLDBERG: What we contend is specific names, if we had given specific names and portions of testimony, that would not be a fair statement of our contentions. What we contend· is the whole thing is tainted and what we were asked is, what are your contentions. And to identify specific names and specific testimony is not a fair statement of our contention. Our contention is the whole thing.
>
> THE COURT: But doesn't the whole thing, at some point, boil down to specifics? Or is it the Government's contention there's no specifics at the core of this at all? Presumably fraud, as I understand the term, has to ultimately come from someone lying for and knowingly lying, whether in submitting documents that they know are false or in submittting [sic] testimony that they know is false.
>
> And seemingly identifying that with the evidence that supports that is not a particularly hard burden, saying, you know, it's John Doe; you know, on such and such a date sending this letter, which he knew wasn't true and the basis for our knowing that is the testimony of Richard Roe who says that. Isn't that what—
>
> MS. GOLDBERG: Well, the basis of our contention is that the corporation, which made the judgment to go forward with its claims and to litigate its claim before the ASBCA knew that the claim was false, and that because of that, even particular information which may in and of itself be true, can be fraudulent in this context where it is offered for the purpose of showing that the costs were due to the Government's actions, when in fact, the costs were not due to the Government's actions.

Transcript of Proceedings at 52–53.

Litton calls number 28 the "single most important interrogatory at issue." It asks

---

**15.** Interrogatory Number 16 asks: "Identify by page, line and words, the precise portions of the following documents defendant alleges constitute the corrupt practice or attempt to practice fraud against the United States in the proof, statement, establishment or allowance of a claim against the United States'." The three documents listed are the extended schedule proposal, its supplement, and a letter from Ingalls to Admiral Rickover.

the defendant to identify which of the 170 findings of fact at the ASBCA is based upon fraud. Nowhere has the government referred Litton to which of these 170 findings of fact is based upon fraud. It merely asserts that the whole proceeding was tainted·with fraud, again avoiding a response with any particularity. The defendant's 1977 answer to interrogatory 28 reads:

> The defendant contends that the 'whole' was tainted by fraud. Once the decision making processing had been set askew by fraud and misrepresentations, the entire proceeding is open to question. The entire chain of events which began on November 23, 1970 with the submission of the extended schedule proposal consists of blocks of logic each the foundation for subsequent findings or inferences. If the initial block is infirm all else crumbles and is open to question. It is impossible to evaluate the situation piecemeal since the Government questions the initial premise.

The government contention that the "whole" is fraudulent is, as the late Chief Judge Marvin Jones once said, "[s]ingularly free from any suspicion of logic." *Belcher v. United States*, 94 Ct.Cl. 137, 140 (1941). Not every witness lied and not every document is false. It is clear to the court that the defendant's responses are not in keeping with the spirit or basic purpose of discovery, not to mention due process. In most instances, the response does nothing more than point out what documents, and what witnesses will be used. In some situations, a response such as this may be adequate, however, when a response provides no specific information and names nearly all the documents and witnesses that have appeared or have been used in the past, there is really no information supplied at all. The 1985 response merely reiterates the 1977 response and, additionally relies upon attachment A and

objects to subparts A and B of 28 on relevancy grounds.[16]

The proper course of action for a party who does not wish to answer an interrogatory after it has been compelled to do so is a motion for a protective order. This is so because the court has already ruled upon the relevancy of the question by ordering it answered. Wright & Miller, § 2289 at 790–91; *Kozlowski v. Sears Roebuck & Co.*, 71 F.R.D. 594, 597 (D.Mass.1976). Further, interrogatories are not limited by the rules of evidence, and the relevancy of an interrogatory is not objectionable as long as it is calculated to lead to the discovery of admissible evidence. RUSCC 26 b(1).

Interrogatory number 29 asks the defendant to "[d]escribe specifically each 'activity' of plaintiff occurring after the filing of the Notice of Appeal on August 14, 1972, which defendant contends 'plaintiff practiced fraud in the disputes resolution process ...' provide the date or dates of each such activity." The defendant responds to number 29A with:

> 29.A.1. Failure to notify the ASBCA of backdated and other spurious information and data in exhibit A [Tab 3] to defendant's answer.
> 2. Preparation of ASBCA charts and testimony in support of position which plaintiff knew was false.
> 3. Submission and causing submission of documents listed in answer 16 above to ASBCA with knowledge of their false and misleading nature.
> 4. Answers 29A.1—29A.3 above described continuing activities throughout the course of the administrative appeal.

It is clear to the court that the response to Number 29A does not respond to the interrogatory at all. The plaintiff is entitled to the specifics of the alleged fraud at the ASBCA, not a general response.

The 1985 response does not improve the defendant's position. The 1985 response

**16.** Interrogatory number 28A asks: "Identify each line, word, number, fact, statement, and conclusion which defendant contends is based upon fraudulent assertions and activities practiced by plaintiff ..." Number 28B refers to number 28A and asks defendant to identify which activities described in 28A related to the ASBCA trial and which related to activities prior to the ASBCA trial.

refers Litton to the much relied upon attachment A. The court is of the opinion that attachment A is the epitome of too little and very late. While it appears to satisfy Litton's legitimate needs in relation to the few documents it addresses, it does not in any manner address the majority of Litton's detailed interrogatories.

Interrogatory number 30 asks the defendant to specify which portions of the record at the ASBCA proceeding are fraudulent. The defendant answered with a statement that it relies upon information contained in the criminal proceeding and described in the indictment and bill of particulars. It essentially tells Litton to fend for itself. The 1985 answer refers Litton to attachment A, and to any and all testimony presented by Litton in support of the claim documents identified in attachment A. Also as part of the answer to number 30 defendant states:

> Additionally, defendant has not completed pretrial preparation in this case and anticipates that other documents, witnesses and evidentiary materials will be offered at trial to demonstrate Litton's practice or attempt to practice fraud in the proof, presentation or statements of its claim.

■ The court is deeply disturbed by the fact that the government, after fifteen years of litigation, is not yet adequately prepared to fully answer these very basic interrogatories. Based upon the plain violations of the intent of the discovery process exhibited by the government in this extended litigation, the court feels that the dictates of due process mandate that it grant plaintiff's motion for discovery sanctions.

#### f. The Appropriate Sanctions

The court is now faced with the question of what sanctions are appropriate in this case. RSUCC 37(b)(2) provides a list of sanctions which are available in situations such as this. They are listed in order of severity. The court has decided to impose, for failure to adequately answer the interrogatories on the fraud questions, sanc-

tions under rule 37(b)(2)(A). This rule tells the court that it may make:

> An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

■ The effect of this order will be to preclude the defendant from proving any of its claims of fraud. Thus the court finds that the plaintiff did not practice fraud in the proof, statement, establishment or allowance of the claim, nor did it practice fraud before the ASBCA. This affects the government's counterclaim, Special Plea in Fraud under 28 U.S.C. § 2514, and the affirmative defense of fraud in the resolution process.

The court recognizes that this decision is nearly tantamount to a dismissal against the United States. A dismissal is appropriate only where there has been a showing of willfulness, or bad faith. *Societe Int. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958); *National Hockey League v. Metropolitan Hockey*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). The court finds that the government has attempted to present a case of fraud where evidence for that case clearly does not exist. This is particularly egregious in this situation where years of prior legal proceedings should have demonstrated this fact. Thus, willfulness to avoid compliance with the court's Order is present. This is so because the government has had two opportunities to inform the plaintiff of the specific acts of fraud involved and has continued to argue that the " 'whole' transaction was tainted." If the government had particular facts available to it, it would, if it were operating on established notions of good faith, disclose them in compliance with the spirit of the discovery process. Furthermore, the government admission that it has not completed pretrial preparation and may include more witnesses means, to the court, that the government does not intend to cooperate fully with Litton's reasonable request for discovery. The government has had 15

years and two full trials to develop its case. The court is convinced, upon the record and counsels' arguments, that another fifteen years would make no difference in the quality of the government's case. They would only further offend the standards of due process.

**Litton's Motion for Summary Judgment**

 While the court is precluded from entering a default judgment against the United States by RUSCC 55(e), it is not prevented from finding facts which ultimately lead to a summary judgment. *Smith v. Schlesinger*, 513 F.2d 462 (D.C. Cir.1975); *Kahn v. Secretary of H.E.W.*, 53 F.R.D. 241 (D.Mass.1971). Here the court has found pursuant to the motion for sanctions that plaintiff did not practice fraud at the ASBCA. Since the only defense to finality of the ASBCA decision would be fraud (because the decision itself was not appealed under the Wunderlich Act provisions), and because fraud is no longer an issue, the ASBCA decision is entitled to finality. *S & E Contractors, Inc., v. United States*, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). Thus, plaintiff is entitled to summary judgment on the question of finality.

Also because plaintiff has been found not to have practiced fraud in the proof, statement, establishment, or allowance of its equitable adjustment, summary judgment in plaintiff's favor is appropriate on the counterclaim and Special Plea in Fraud under 28 U.S.C. § 2514 (1982).

The court, although it does not reach the issue preclusion or collateral estoppel issue, notes that the ASBCA has at least implicitly determined that no fraud was practiced before it. The ASBCA was well aware of the allegations of fraud in the air and at one point told the defendant to point out any attempt to practice fraud so that the evidence could be disregarded. The defendant, so far as this court can tell, never did point out any fraudulent evidence during that proceeding. No additional evidence has been brought to light by defendant since that date.

The plaintiff is entitled to final payment. The court orders, pursuant to RUSCC 37(b)(2)(A), that the defendant is precluded from putting on any evidence of fraud in support of its counterclaims, Special Plea in Fraud or affirmative defense of fraud in the resolution process. The clerk is directed to enter judgment for plaintiff in the amount of $17,361,586. Also, the defendant is ordered, pursuant to RUSCC 37(b)(2), to pay plaintiff's reasonable attorney fees incurred as a result of obtaining this order. Costs to plaintiff.